(No. 20753.—

THE DAYTONA GABLES DEVELOPMENT COMPANY, Appellant, *vs.* THE GLEN FLORA INVESTMENT COMPANY *et al.* Appellees.

*Opinion filed October 23, 1931.*

LITSINGER, HEALY & REID, for appellant.

WEST & ECKHART, (WILLIAM M. KLEIN, and LEWIS C. JESSEPH, of counsel,) for appellee Lawrence W. Ferguson; PRITZKER & PRITZKER, (REUBEN L. FREEMAN, of counsel,) for other appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The Daytona Gables Development Company brought a suit in chancery against the Glen Flora Investment Company and certain individuals to compel the specific performance of a contract under which the complainant claimed to be entitled to a conveyance of 1013 acres of land in Volusia county, Florida. After the filing of the original bill an amended and supplemental bill was filed, which was answered, and upon which, after a reference to a master and a report by him finding the equity of the cause with the complainant and recommending a decree accordingly in its favor, the cause was heard by the chancellor, who sustained exceptions to the master's report and rendered a decree dismissing the bill for want of equity, from which the complainant has appealed.

The contract which the complainant seeks by its bill to enforce specifically was received in evidence as complain-

ant's exhibit "39," and a copy was attached as exhibit "1" to the original bill. It is as follows:

"Mr. H. J. Goldberg, Daytona, Florida:    "January 29, 1926.

"DEAR SIR—In accordance with resolutions passed by the board of directors of the Glen Flora Investment Company at a meeting held on Thursday and Friday, January 28 and 29, you are respectfully informed that the ten thousand one hundred eighty (10,180) acres more or less, comprising what is commonly known as 'Volusia tract No. 3,' or so much of it as is clear or acceptable to the purchasers, is to be sold at one hundred dollars ($100.00) an acre, less ten per cent (10%) commission, netting to the Glen Flora Investment Company ninety dollars ($90.00) per acre, net.

"It is understood that the undersigned will work out the plan with you, and with such parties to whom portions of the land were sold, so that approximately one thousand eighty (1080) acres may be included in one sale as a separate entity from the remaining lot, and approximately nine thousand one hundred (9100) acres being included in a separate sale, each, however, to net the sum above designated.

"The terms and conditions of the sale of the two tracts shall be along the lines set forth in a contract between one George Marks and one M. R. Ray; that is to say, we will apply all moneys received from Briskin or any other source towards the first payment on the whole ten thousand (10,000) acres, and if the sum received from Briskin, Ray, or any other person, together with the commissions that you are entitled to thereunder, is sufficient to pay for the one thousand (1000) acres, then you are to receive a deed for the 1000 acres without further payment, and subject only to the remaining amount of mortgage or notes; it being the intention that we are only to receive ninety dollars ($90.00) per acre net, fifteen dollars ($15.00) per acre cash and seventy-five ($75.00) per acre by way of first and second mortgages.

"It is further understood that any cash available over and above the sums that we are supposed to receive on or before April 1 shall be applied towards the minimization of the mortgage on the one thousand (1000) acres.

"It is understood that the ultimate purchasers and the undersigned will work out the details of the apportionment of mortgages, release clauses, etc.

   "Yours very truly,
        GLEN FLORA INVESTMENT CO.
           By L. W. Ferguson, *Prest.*
           By Marvin H. Brook, *Secy.*

"I have read the above, understand the terms, and they are acceptable to me.          H. J. GOLDBERG."

This agreement was the culmination of a series of transactions in Florida real estate beginning in the summer of 1925, when the excitement over the Florida bubble was at or near its top pitch. The individual defendants who were joined with the Glen Flora Investment Company were Isadore Whiteson, Lawrence W. Ferguson and N. J. Pritzker, and the relief sought against them was the return of certain money which it was alleged they had received as their share of a part of the capital of the corporation. An accounting was also prayed for between the investment company and Goldberg, though he was not a party to the bill. Ferguson was the president of the Fidelity Trust and Savings Bank of Chicago, Whiteson was vice-president, and Goldberg had been the head of the real estate department of the bank. These three made up their minds to organize a corporation for the purpose of speculating in Florida lands, and on July 9, 1925, they made an agreement to form a company to be known as the Northern Bankers Investment Company, to operate in the purchase and sale of real estate in the State of Florida. The agreement recited that in the formation of the company the three associates had interested their various friends to place various sums of money towards the purchasing and selling of real estate in Florida, and in consideration of the services rendered by the three it was understood and agreed that the net earnings of the "parent company" should be divided equally among Ferguson, Whiteson and Goldberg, the net earnings to be earnings from all sales, commissions and all transactions pertaining to Florida property. This agreement was supplemented by another dated July 22, 1925, among the three, in which it was stated that it was understood and agreed that the three should comprise a committee who should have the final power to pass upon all matters of the syndicate formed under date of June 9, 1925, and it was further agreed that upon any of these matters a vote of the majority should be binding upon all. Whiteson then wrote and

sent about two hundred letters to Florida to various people, real estate brokers, lumber companies, turpentine companies and other sellers of real estate. In response to these letters he received a number of offers—possibly one hundred. A few days later Whiteson and Goldberg, with two or three others, went to Jacksonville, Florida, where they met and interviewed the agents of these various companies and made arrangements to look at the property offered. The following Sunday they went to Daytona and looked at three tracts of land, one of about 10,000 acres, another of about 12,000 and the third of nearly 15,000 acres. They negotiated with the Tomoka Land Company. On June 15 Whiteson paid $5000 to this company and received a receipt for that amount as a binder on approximately 23,278 acres of land in Daytona, stating that the price was $30 an acre for 10,028 acres on the south end of the tract and $20 for approximately 13,250 acres on the north end. The smaller tract is the one involved in this suit. On June 20, 1925, a contract was entered into between the Tomoka Land Company and Whiteson for the purchase by the latter of 10,180.49 acres, all specifically described in an exhibit attached to the contract, the consideration of which was stated to be $30 an acre, amounting to the sum of $305,414.70, of which $7750 was paid in cash, $20,000 was to be paid on or before October 20, 1925, $33,332.94 on or before January 2, 1926, and $61,082.94 on or before January 2 in each of the years 1927, 1928, 1929 and 1930, with six per cent interest from July 1, 1925, payable semi-annually. Goldberg and Whiteson returned to Chicago and called a meeting of all those who had contributed money, and the first meeting of all the investors was held at the Edgewater Beach Hotel in July, 1925. About ninety-eight per cent of the investors were present, together with the three members of the "parent syndicate," Whiteson, Ferguson and Goldberg. At this meeting they discussed the work done in Florida, the organization of the new corporation and the

officers. Goldberg returned to Florida. Captain Clark, who was the professional golf instructor of the Daytona Golf and Country Club, was interested in developing a golf subdivision in the tract and made several propositions to Goldberg with reference to it.

A number of telegrams were exchanged between Goldberg and Whiteson in regard to the sale of parcel "D" in tract 3, or a part of it. On August 17 Whiteson sent Goldberg a telegram in which he stated that the syndicate declined to sell parcel "D" at $100 an acre. On August 18 Goldberg telegraphed to Whiteson that he had sold tract 3, containing 10,180 acres, to George Marks, of New York, at $75 an acre and had accepted a binder of $20,000, $10,000 additional in thirty-sixty days, $190,884.14 January 2, 1926; $143,163.14, and the remainder, in four equal payments on the same day in the years 1927, 1928, 1929 and 1930, commission ten per cent, two-thirds broker, one-third syndicate, payable closing deal. Whiteson telegraphed back that the proposition would be submitted to a special meeting of "the board of directors for approval to-morrow evening." Telegrams were exchanged, but in the end Whiteson on August 28, 1925, signed the contract of sale dated August 22, 1925, for the consideration of $75 an acre, amounting in the aggregate to the sum of $763,536.75, payable $20,000 cash, $10,000 on or before thirty days after date, $10,000 on or before sixty days after date, $150,884.14 on or before January 2, 1926, and $143,163.14 on or before January 2 in each of the years 1927, 1928, 1929 and 1930, with six per cent interest, payable semi-annually. Marks executed a declaration of trust on September 1, 1925, that he held title to the property as trustee for Goldberg, and certified that he had no right, title or interest in and to said property except as such trustee, and in the same instrument, in consideration of $10 and other good and valuable considerations, he appointed, irrevocably, Goldberg to be his lawful attorney in fact to sell and convey the land

or any parcel thereof, either by private contract or public auction and either together or in separate parcels and lots, for such price as should be deemed to him advisable, and authorized him to give a good receipt for the purchase price and to execute a deed, and to do everything necessary to carry into effect any agreement of sale made of said lands.

Goldberg testified that on August 20, 1925, he was in Jacksonville, Florida, and on that day organized the syndicate to purchase tract 3 at $75 an acre from Whiteson. That was the Marks syndicate. There appears in the record a contract purporting to be between Marks and M. R. Ray, dated October 2, 1925, for the sale of 9167.49 acres, which includes all of the land included in the contract between Whiteson and Marks except parcel "D," consisting of 1013 acres. The consideration was $100 an acre, $916,749, to be paid $25,000 cash, $10,000 October 8 and $10,000 October 18, and the remainder in installments falling due in the years from 1926 to 1930. The instrument is signed, "George Marks, by H. J. Goldberg, by power of attorney," and bears no certificate of acknowledgment.

The syndicate which Whiteson, Ferguson and Goldberg had originally organized, as indicated in their agreement of June 9, caused a corporation composed of themselves and their associates to be organized as a corporation by the name of the Glen Flora Investment Company, the defendant, on September 12, 1925, in the State of Florida, with a capital of $122,500. Whiteson, Ferguson, Goldberg and Pritzker were among the seven directors elected for the first year. Whiteson assigned to this company all the contracts which he had made for the purchase of land. The first meeting of the directors was held on November 5, 1925, at which Ferguson, Whiteson, Pritzker and Goldberg were present, and a resolution was adopted approving and ratifying all the acts of Whiteson in reference to contracts of sale entered into by him and assuming the payment of

all mortgages and notes made by him as part purchase price for the land bought, and further providing that Ferguson, Whiteson and Goldberg were to receive for services rendered by them in inspecting and purchasing the real estate and in the promotion of the corporation, a sum equal to twenty-five per cent of the net profits earned by the corporation, payable only as and when dividends were declared and ordered paid to the stockholders. It was further provided that the three should account to the corporation for any commission or split commission that they might receive from brokers in the purchase of the property, and that they should receive no further or other compensation for any services that they might render to the corporation, either as officers or directors, and the net profits contemplated should mean all moneys divided among the stockholders after the principal had been paid to them.

On December 8, 1925, the Glen Flora Investment Company notified Marks by registered mail of the amount due from him on January 2, 1926, authorizing him to place the amount to the credit of Whiteson at the Barnett National Bank of Jacksonville, Florida. At the time of signing the contract with Marks, Whiteson had signed an agreement reciting the contract between Whiteson and Marks, in which it was stated that for and in consideration of Edward Hamler procuring a purchaser for the land and in consideration of his being a licensed real estate broker, Whiteson agreed to pay him sixty-six and two-thirds per cent of ten per cent commission on the purchase price of $75 an acre, or the sum of $5 an acre commission, the commission to be payable upon the closing of the deal, or, in other words, on January 2, 1926, or such time before as it might be paid. This contract was signed by Whiteson and purported to be signed by Hamler. It was prepared and sent by Goldberg to Whiteson with the contract of sale, and amounted, in connection with Goldberg's telegram of August 18, to a representation that Hamler had

made the sale, as broker, to Marks and the six and two-thirds per cent commission was due to him, when, in fact, he had nothing to do with the sale, knew nothing about it, did not know Marks and did not sign the contract to which his name was signed by Goldberg. Hamler was a member of the firm of Hamler, Garland & Co., of which Goldberg was also a member. On December 19, Ferguson, Whiteson and Pritzker left Chicago for Jacksonville, arriving on December 21. The next day Ferguson and Whiteson went to Hamler's office and remained there about an hour and a half or two hours, where they received some information which afterward they communicated to Goldberg. Ferguson testified that he met Goldberg and informed him that there were some surprising developments regarding the Marks deal, and he referred to the visit to the office of Hamler, who was supposed to be the broker in the Marks deal. Goldberg told him that he had received an assignment of the Hamler interest in that transaction. Ferguson saw Goldberg again in Pritzker's room when Pritzker, Whiteson, Goldberg and Ferguson were present. They told Goldberg about calling at the office of Hamler for the purpose of ascertaining whether it would be possible to close the deal before January 1. Hamler told them he did not know anything about the deal referred to and did not know Marks and did not know he (Hamler) had any commission coming. They also told Goldberg that they showed Hamler the contract relating to commissions in the Whiteson-Marks deal, and Hamler said he never saw the document and that it was not his signature but said his signature was a forgery and that he never discussed the deal or the property involved with Goldberg. Goldberg wanted to know whether a commission of $50,000 would be allowed if he was ready to close the deal. Ferguson told him no, it would not be until they found out who the proper party would be to pay the commission to. Then Goldberg told them that he held an assignment of Hamler's

interest and that he was prepared to close the deal if the commission would be deducted and the moneys paid that would have to be paid in order to close. Whiteson stated that Goldberg's conduct was unethical and dishonest, and that as far as he was concerned there would never be a commission allowed on that transaction and that the stockholders would have to "base" their opinion as to their willingness to pay this commission. Goldberg stated that he was a partner in the firm of Hamler, Garland & Co., that the company had negotiated the deal, and that he, as a partner in the company, would be entitled to the commission, regardless of the fact that Hamler had not signed that contract.

It was during this visit to Florida that Whiteson, Ferguson and Pritzker learned of the contract of Marks with Ray for the sale of 9167.49 acres of the 10,180.49 acres at $100 an acre, excepting out of the contract 1013 acres. None of them had ever heard of the contract or of Briskin before that time except Whiteson, who had met Briskin in July in Chicago when Briskin had said to him he wanted to buy the property at $100 an acre. Whiteson had heard nothing from him since and had not heard that he had bought the property. Goldberg informed them that the property had been sold to Briskin, who caused the contract to be taken in the name of Ray as a dummy and had re-syndicated the property and in Goldberg's opinion had money enough to pay them now, but if he were short of any money Goldberg would allow the $50,000 commission which was due him, to ride as part of the cash consideration. Afterward Pritzker was introduced to Briskin and asked him what he had to do with the matter, and he said he was a representative of the syndicate buying the 9100 acres and showed Pritzker the Ray contract. Pritzker asked Goldberg whether this instrument had anything to do with re-selling the property at $50 an acre more, and Goldberg said that he was very much interested in it because he had a one-fourth interest in it somewhere. Pritzker said it

did not seem honest, and, since Goldberg was a representative of the Glen Flora Company, if he was selling the land for $150 an acre, or if he were selling it for $100 an acre, the Glen Flora Company should get that difference of $25, and that although Goldberg was a representative of the Glen Flora Company he was personally profiting $25 an acre, or $50,000, by the scheme that he was trying to put through. Pritzker stated that he did not know whether the members of the Glen Flora Company would permit this. Goldberg said that the members of the Glen Flora Company did not have to know anything about it, but Pritzker said it was his duty, as attorney for the company, to tell them the facts. Briskin said he did not want Pritzker to break up the deal, because he sold and bought the property in good faith, and though he knew nothing about this action with Goldberg he did not want anything done to interfere with the syndicators but wanted the property. Other discussion followed. Briskin stated that he had not enough money to pay the amount due January 2, and Goldberg said he had no money and could get it only through Briskin, and that Marks amounted to nothing in this—that he put in some money but Goldberg paid him back. He asked Pritzker not to break up his improvement at Daytona of Daytona Gables, saying that he had made an extensive improvement there and stood to win ten or twelve million dollars. The result was that Briskin gave Pritzker his check for $50,000, payable to Pritzker, with the understanding that it was to be applied on the Marks contract and Marks should give Briskin credit for $50,000. If the Glen Flora Company defaulted Marks, the $50,000 should be a payment on the purchase price on a sale of the land to Briskin. A letter to Ray was introduced in evidence, referring to his contract with Marks for the purchase of the 9167.49 acres and Marks' contract with Whiteson for the purchase of 10,180.49 acres, and offering, if and when all the rights of Marks under his contract with Whiteson to purchase

the land described in his contract shall have been completely terminated, to sell to Ray the land described in his contract with Marks on the terms stated, which included a credit on the purchase price of $50,000 paid in cash and the $45,000 paid by Ray to Marks. Neither Briskin, Ray, Marks nor Goldberg paid or tendered the money due on January 2, 1926, and on January 9 a notice of forfeiture for such default was given to Marks.

A stockholders' meeting of the Glen Flora Company was held at the Edgewater Beach Hotel, in Chicago, on January 27, 1926, at which Goldberg, Whiteson, Ferguson and Pritzker were present. Whiteson made a report of what occurred on the occasion of the visit of Ferguson, Pritzker and himself to Florida, of their discoveries in regard to Hamler, the alleged broker in the Marks sale, Goldberg's connection with him, and that Marks was simply a dummy for Goldberg. He showed a plat of Goldberg's subdivision and told the stockholders that Goldberg was selling lots for $3500 and $4000 a-piece to the people, and it looked as though he was cleaning up millions, and the Glen Flora was not getting any money out of this because Goldberg was double-crossing them. Goldberg said he would be able to clear himself in the eyes of the stockholders, and, upon motion made, the matter was referred to a committee consisting of Ferguson, Whiteson, Berthold Weis and Pritzker. The committee held two meetings, and the result of its action was the agreement of January 29, 1926, which has been set out. On the next day Goldberg entered into the following agreement with the Daytona Gables Development Company, the appellant:

"This agreement entered into this 30th day of January, A. D. 1926, by and between H. J. Goldberg of the first part and Daytona Gables Development Company, a corporation, of the second part, witnesseth:

"In consideration of the issuance to party of the first part of two thousand (2000) shares of the capital stock of second party and in full payment therefor, party of the first part does hereby assign, transfer and convey to party of the second part all his

right, title and interest in and to the following pieces or parcels of land situated in Volusia county, Florida, to-wit: The whole of section twenty-seven (27) west of the center of Tomoka creek and north of Daytona-Deland highway, and the whole of section twenty-eight (28) west of the center of Tomoka creek and north of Daytona-Deland highway and the whole of section thirty-three (33) north of Daytona-Deland highway and the whole of section thirty-four (34) north of Daytona-Deland highway and west of Tomoka creek, all in township fifteen (15) south, range thirty-two (32) east. First party does also assign, transfer and convey to second party all his right, title and interest, whether of his own right or acquired as assignee and grantee of George Marks, in and to a contract between George Marks and Isidore Whiteson dated August 22, 1925, also in and to a contract between George Marks and M. R. Ray dated October 2, 1925, and also in and to a contract between party of the first part and Glen Flora Investment Company dated January 29, 1926.

"In witness whereof the party of the first party has hereto affixed his name and seal and the party of the second part has hereunto caused these presents to be signed by its proper officer and its seal affixed, attested by its secretary, the day and year first above written. DAYTONA GABLES DEVELOPMENT CO. [Seal.]
By H. J. Goldberg, *President.*

"Attest: L. E. Randall, *Secretary.*

"Signed, sealed and delivered in the presence of Joseph F. Cervinka, Daniel M. Healy. [Corporate Seal]"

On May 11, 1926, the appellant filed the bill in this case.

The corporation organized under the agreement of June 9, 1925, took the name "Glen Flora Investment Company" instead of "Northern Bankers' Investment Company," but the relation of the parties executing that agreement to each other and to the corporation subsequently formed did not change. They were still members of the "parent company" engaged in a joint adventure and neither could make any charge for his services except by the consent of the other two. Goldberg claims to have had an agreement with Whiteson and Ferguson for a commission of two-thirds of ten per cent, which Whiteson denies. At any rate, whether he had such an agreement or not, he was an agent of the company in making the sale to Marks and was bound by the obligations which attach to that relation.

He could not sell to himself and could not have any interest in the purchase of property of his principal which he was selling. The doctrine is familiar and of frequent application by the courts, that an agent cannot have any interest, either direct or indirect, in the sale of the property of his principal within the scope of his agency without the consent of his principal freely given, with full knowledge of everything known to the agent which might affect the interest of the principal; and it is of no consequence that no fraud was intended or advantage in fact derived by the agent. (*Tyler* v. *Sanborn,* 128 Ill. 136; *Fox* v. *Simons,* 251 id. 316.) This principle applies to the present case to bar the appellant from any relief.

About the last of July, 1925, Goldberg returned from Chicago to Jacksonville. In Chicago he visited Whiteson in a hospital, where he was, and told him he had a letter from Captain Clark, who proposed to build a golf course on a part of the land. Whiteson asked what the proposition was. It was a three-page letter which they read over, and Goldberg said that it sounded like a very good proposition; that if they could build an eighteen-hole golf course for $15,000 and put it in the center of the 10,000 acres it would materially enhance the value. Whiteson said he did not know anything about golf courses, and they sent a telegram to Clark, "One of our associates is sick in the hospital." After his return Goldberg telegraphed Whiteson on August 10: "Conference Captain Clark relative golf course; recommend going into deal or may persuade him to purchase outright at $100." Again on August 12: "Why don't you reply on Daytona golf proposition? Can probably get him to purchase about 600 acres outright at $100. However we must make definite reply. Might probably get offer $75 tract 3. Consider this price good. Advise if I should go any further." August 13 Whiteson replied: "Unanimously decided to sell Clark parcel 1—555 acres or less—in preference to partnership. Advise best terms you

can get. Want $100 for balance of tract. Should be worth more if Clark buyer for golf course." Goldberg telegraphed to Whiteson on August 14: "Clark cannot use tract 1 account 80 acres in center on road. Also must drain in river. Must have acreage adjoining river. Can get him pay $100, balance 1, 2 years. Third cash. No matter where golf course goes will enhance our property. Answer to-day." Again, August 16: "Clark indignant. Insists upon our entry into golf development. Has let contracts for development, clearing, completed surveys and ordered drainage survey. Has conferred with attorneys and is prepared to tie property by lien. Can probably sell tract at $75 and have purchaser go through with golf deal. Recommend sale of entire tract at $75. This would be handsome profit. We should take advantage before lull. Acres not moving very fast." August 17 Whiteson, Pritzker and Pearlman wired Goldberg: "Managers of syndicate decline to sell any part of parcel 'D' at $100 per acre unless at same time all rest is sold at not less than $75." August 18 Goldberg wired Whiteson: "Sold tract 3, Volusia county, $75. $20,000 binder. $10,000 additional 30, 60 days. Night letter follows." The following is Goldberg's night letter of the same date: "Supplementing wire tract 3 containing 10180 acres sold to George Marks, New York City, $75 acre. Accepted binder $20,000, $10,000, 30, 60 days, $190,884.14 January 2, 1926, $143,163.14 January 2, four (4) consecutive years, interest six per cent. Commission ten per cent, two-thirds broker, one-third syndicate, payable closing deal. Purchaser will assume golf course." After the interchange of several more telegrams and letters the contract of sale of the whole tract to Marks for $75 an acre was finally executed by Whiteson on August 28 and by Marks on August 31.

Marks' declaration of trust in favor of Goldberg, power of attorney and quit-claim to him is dated the next day, September 1 and is acknowledged October 2, 1925. Marks'

contract of sale to Ray dated October 2, 1925, and signed, "George Marks by H. J. Goldberg by power of attorney," is of interest in this connection, as well as the following instrument also dated October 2, 1925:

"DAYTONA, FLA., *October 2nd, 1925.*

"I, Herman J. Goldberg of Chicago, Illinois, in consideration of the execution and delivery to me by George Marks of Kings county, New York, of an assignment, power of attorney and trust memoranda do hereby agree to return to said George Marks the ten thousand dollars heretofore advanced by him for the purchase of said property and do hereby agree to pay to the said George Marks one-fourth of the entire net profit realized by me from a sale by me of nine thousand (9000) acres of said property to M. R. Ray of Volusia county, Florida; the return of said money to be made on the 20th day of October, A. D. 1925, and said profits to be paid over when the same are received by me. No portion of the profit realized from the sale of the remaining one thousand acres of said property shall be paid to the said George Marks. Said profit to be twenty-five dollars per acre less five per cent commission.                    HERMAN J. GOLDBERG.

"I hereby agree to the above arrangement for the accounting to me of said profits upon said property to me, said assignment, power of attorney and trust memoranda covering certain property in Volusia county, Florida, lying approximately six miles west of the city of Daytona, Florida, and along the road to Deland therefrom.                    GEORGE MARKS."

The payment of half of this $10,000 was acknowledged by Marks in the following receipt, dated October 3, 1925:

"DAYTONA, FLORIDA, *October 3, 1925.*

"Received of Herman J. Goldberg five thousand dollars evidence of one-half of binder money advanced by George Marks on purchase of ten thousand acres on Deland road west of Daytona, Florida, known as Tract No. 3 from Isadore Whiteson. Balance of binder money due is five thousand dollars.
                    GEORGE MARKS."

Another circumstance bearing on the question of Goldberg's fidelity to his associates is shown by the testimony of Captain Clark, and that circumstance is that all the pretended information which Goldberg so persistently im-

pressed on them in regard to the construction of the golf course by Clark was false, except the bare fact that he was constructing such a course. Besides the telegrams which Goldberg sent to Whiteson on this subject which have just been referred to, Whiteson received on August 18 this one, purporting to be from Clark: "Your time for reply up to-night. Have seen Clark of Consolidated. Legal action starts to-morrow." Concerning the telegram, Clark testified that he did not send any such telegram, did not know Whiteson, never heard of him and never heard his name mentioned; and as to the subject matter of Goldberg's telegram of August 20, that he never filed any affidavit of lien, started any action or spoke to anyone about starting an action; that he never threatened to file affidavits of lien, never mentioned such a thing to Goldberg, and never spoke to Goldberg as having a claim against Whiteson or any of his associates; that he did not know Judge Reynolds and never knew him, and never made an offer of $100 an acre for land.

Another pertinent circumstance relates to Goldberg's claim of a commission. He was entitled to no commission except under a contract with Whiteson and Ferguson, and he claims to have had such a contract for two-thirds of ten per cent. This claim, however, is denied. He said nothing about any commission for himself in his correspondence with Whiteson, but in the record an agreement appears, dated Jacksonville, Florida, August 22, 1925, for a commission of sixty-six and two-thirds per cent of ten per cent commission on the purchase price of $75 an acre, or $5 an acre, to Edward Hamler, in consideration of his procuring a purchaser for the land included in the Marks contract, payable on closing the deal, or, in other words, at the time of the first one-quarter cash payment on January 2, 1926, or such time before as may be paid. This contract purported to be signed by Hamler and witnessed by Carl B. Mays and Louis E. Bower and was signed on

August 28 by Whiteson. This indicates that Goldberg did not at that time regard himself as entitled to a commission. Goldberg's connection with this contract has already been shown in an earlier part of this opinion. Though he stated that he did not know the name of Hamler's firm he later testified that he was a member of it, and though he admitted he signed Hamler's name to the agreement he testified he did it with Hamler's consent, because Hamler was a licensed broker and he was not. In fact, Hamler had nothing to do with the sale of the land and knew nothing about it. Hamler assigned this contract to Goldberg on September 16, 1925, and on January 20, 1926, wrote a letter to Goldberg stating that the signing of his name to the instrument only as a broker was in keeping with the oral agreement he had with Goldberg at a previous date. If it was true that Goldberg had a contract with Whiteson and Ferguson for six and two-thirds per cent commission, there was no reason why he should have Whiteson make a contract with Hamler for sixty-six and two-thirds per cent of ten per cent commission. It would not have been unlawful for them to pay him the commission if they had agreed to, and the fact that he had not a broker's license did not justify him in deceiving them to make them believe they owed a commission to Hamler. His action indicates that he was at least doubtful about his right to the commission, and for that reason he deceived his principal to induce him to enter into a contract to pay a commission to Hamler under the belief that Hamler had found the purchaser, which Hamler would pay to Goldberg. If Goldberg had an honest claim to the commission there was no reason why he should have deceived his associates and induced them to allow a commission where none was due. If he had believed that he had such an agreement it seems hardly reasonable to suppose that in addition to his statement of the terms of sale in his telegram to Whiteson on August 18, including "commission ten per cent, two-thirds

broker, one-third syndicate, payable closing deal," he would have thought it necessary to send along with the contract of sale a spurious agreement for a commission to Hamler, his partner, to which he had signed Hamler's name. Our conclusion is that he had no agreement for a commission, that he had no right to a commission, for he could have no such right except by agreement with his associates, and that his palming off the spurious paper as a contract with Hamler was a device adopted for the purpose of deceiving his associates and securing to himself, without their knowledge, a commission of $50,000 to which he was not entitled.

Goldberg left Chicago for Florida on July 29 and on August 20 he was in Jacksonville. On that day he testified he organized the George Marks syndicate to purchase tract 3 at $75 an acre from Whiteson. A syndicate is an association of persons for the purpose of carrying out some enterprise or scheme requiring considerable capital. This means that Goldberg created the syndicate and became a part of it. His notion about his duty to his principals may be ascertained by a consideration of a part of his testimony in regard to an interview with Whiteson, Ferguson and Pritzker during their visit at Jacksonville in December, 1925. His testimony as it is abstracted in part is as follows: "Whiteson and Ferguson got back about 5:00 o'clock that evening and we again met at the hotel in Mr. Whiteson's room, at which time Whiteson was very highly excited. He said: 'I talked to Hamler. Hamler has got nothing to do with this commission agreement. He never saw the property. He don't know who Marks is. You have double-crossed us, and I am not going to go through with this deal. Marks is a dummy. You had this sold to Briskin before you ever entered into this contract with Marks. You used Clark as a club over us to get us to sign this contract. Now, this property has been re-syndicated at $150 an acre, and the only way I am going to sell this property will be at $150 an acre.' * * * Whiteson further said: 'You

have gone along and sold lots in your development there. You have not got any title to it, and if you don't do as I tell you to I am going to get you into a barrel of trouble. You ought to be in jail.' I said, 'Well, you ought to be.' I thanked him for his advice as to where I ought to be—that I knew where I ought to be—and I told him that his assumption that Marks was a dummy was absolutely without foundation; that Marks was very much alive and in Daytona at that time; and the fact that Hamler had not seen the land or didn't know Marks; that I was not responsible for anything that Mr. Whiteson said to me at that time because I didn't believe him anyway. I said I didn't believe him, and I told him that. I said: 'The fact that Hamler did not see this property down in Daytona maybe is true. Hamler gave me authority to use his name on this commission agreement because he was an authorized broker and I was not, and in the event there was any trouble there would be an authorized real estate broker to handle the commission. He also gave me an assignment to his commission.' I said: 'I know what you have done. You went down to Hamler and tried to browbeat him. You took him to Judge Reynolds' office and threatened him with lots of things unless he signed various documents, but, thank God, he had a lawyer that would not let you bluff him into anything. But you have his mind running in such a channel now that he is trying to figure how he can get some of his commission. Now, you have got to pay this commission. This deal was made, and it should not make any particular difference who gets this commission. You remember, back in Chicago, when I left on—, (I will refresh my memory on the date,) when I left on July 29, that we had an agreement as to the commissions. I don't know what you [referring to Mr. Whiteson] have done in this Glen Flora matter to be of any material assistance to the stockholders. You have not made any money for them. The only thing you have done is killed deals.

The only thing you have done is made yourself a bunch of enemies on this whole Florida transaction. I am the only one that created any value. I am the only one that created any profits for this syndicate. I took this property at $30 an acre and re-syndicated it at $75 an acre. I then sold it to Briskin at $100 an acre and had him re-syndicate it at $150 an acre. It is perfectly all right for you to sit back in Chicago, but I want you to understand that business is done differently down here in Florida. There is not anybody coming down to buy any 10,000 acres or 15,000 acres of ground, or any other tracts, alone. They are all bought in syndicates, and some particular person creates the syndicate by getting a commission on the sale of the property and then letting his commission ride in, and that makes the syndicate. That is what I have done in this particular instance and in two or three other instances.' I said: 'It may all be new to you, Mr. Whiteson, and may be new to you, Mr. Ferguson, but as far as Mr. Pritzker is concerned he has been a party to several syndicates and knows what I say is absolutely true. That is the only way prices are created down here. It is not through intrinsic values but through re-syndication of properties. And the fact that I have been able to create these profits through re-syndication, it should not make any difference to you whether I am interested in half a dozen of these syndicates.' I said: 'You gentlemen know what some of our associates at the bank have done. They have re-syndicated one piece of property from $100 an acre to $2000 an acre and have been in eight or nine syndicates— a regular chain of syndicates; and,' I said, 'the same thing applies here. Now, you are either going to go through with this proposition and realize that I have been the only asset to this organization. I don't know of any asset that Ferguson has been. He has been back at the bank there and knows nothing about real estate. As far as Whiteson is concerned, he knows nothing about land. He may be a

good mortgage man but knows nothing about real estate; and,' I said, 'Pritzker is the only one here that understands this syndicate proposition.' "

The conclusion is irresistible from all the circumstances that the George Marks syndicate, as Goldberg called it, not only was managed and controlled by Goldberg after the sale to Marks but that that was the intention in making the sale. No sooner was the contract completely executed than Marks on September 1 executed the declaration of trust in favor of Goldberg, the power of attorney and quitclaim deed, so that Goldberg was in complete control of the land. A month later Goldberg sold it to Ray, executing the contract in Marks' name by himself as attorney but excepting the 1000 acres or more in controversy in this case on which Clark and Latta constructed the golf course. Thus he acquired for himself all the interest in the tract in question which Whiteson acquired from the Tomoko Land Company without the payment of a dollar, and in addition claimed that the Glen Flora Company owed him $50,000 commission for the operation which resulted in this transfer of interest. He then began the improvement of this tract, using the name of H. J. Gould in his advertisements, for which in his testimony he gave the reason that the State had been flooded with Jewish operators and developers and there was a prejudice against them. He claimed to have spent $15,000 in the improvement of this tract as Daytona Gables, and he sold one hundred lots, some of them for $3500, $4000 and $5000 each, and he had received $20,000 in cash. There were five lots to the acre. All this was the interest which Goldberg acquired in the property which he sold as agent. He was one of the "parent syndicate" named in the contract of June 9, 1925. He sold as agent of that syndicate, and the contract was finally executed on August 31, 1925. The next day Goldberg was the purchaser, and he had acquired the possession and control of the land in controversy in this case for his

own development as the result of his betrayal of the interest of his associates by reason of his interest in the purchase by Marks, of which he failed to inform them.

The master found that Goldberg formed the Marks syndicate and proceeded to find buyers who contributed money and with him formed the syndicate. To this Marks syndicate Goldberg sold the 10,180.49 acres at $75 an acre—a profit, on paper, of $45 an acre, amounting to $458,000. In fact, the Glen Flora Company at the time of the trial had received less than nine dollars an acre for the land which it had bought for $30 an acre. Goldberg interested Briskin in the land, and succeeded in selling to him, in the name of Ray, the land remaining in the Marks syndicate (9167.49 acres) for $100 an acre—another profit of $229,000—and Goldberg testified that Briskin had resyndicated the land at $150. If the property is sold at this price and paid for, the Briskin syndicate will have another profit of $458,000. The master found, no doubt correctly, that these transactions were fair illustrations of the manner of buying and selling real estate in Florida during that time. This record is a fair illustration of what happened to many investors in Florida real estate during that time; and what happened there as the result of two or three years of that kind of high finance is a matter of public knowledge. However common such methods of trading may be, they do not meet the standard of integrity and fair dealing which the law requires of an agent in transacting business for his principal. Without his principal's consent an agent employed to sell cannot become the purchaser; if employed to buy he may not be the seller. The doctrine is not based on the idea that the transaction is necessarily an injury to or a fraud upon the principal, but on the idea of closing the door to temptation to fraud and keeping the agent's eye single to the rights and welfare of his principal. The interdiction is enforced with a strong hand in courts of justice. The principle is one of preventive, not remedial,

justice, which operates, therefore, however fair the sale may have been. 21 R. C. L. 830.

Under the rule that an agent may not have an interest in the business of his principal within the scope of his agency without the consent of his principal, without full knowledge of every matter known to the agent, Goldberg could not recover damages for a breach of Marks' contract. He could not have a decree in a court of equity for its specific performance and he could not recover his commissions in any action he might bring. The complainant, his assignee, is in no better position. Goldberg was president of the Daytona Gables Development Company at the time he made the assignment of the contract which is the basis of this suit, in consideration of the issue to him of two thousand shares of the stock of that corporation. It could have no higher equity than its assignor.

Even if the case of the complainant were free from the infirmity which we have discussed so far, the contract itself is not of such a character as a court of equity can specifically enforce. In the first place, to enable a party to a contract for any interest in land to enforce the specific performance of it the contract must be in writing, and this means that the whole contract must be written, so that all its terms and provisions can be ascertained from the writing itself, without the necessity of a resort to extrinsic evidence. (*Gronowski* v. *Jozefowicz,* 291 Ill. 266; *Sallo* v. *Boas,* 327 id. 145; *Kopprasch* v. *Satter,* 331 id. 126.) The contract cannot rest partly in writing and partly in parol; partly in the written instrument and partly in the testimony of witnesses. (*Farwell* v. *Lowther,* 18 Ill. 252; *Hamilton* v. *Harvey,* 121 id. 469; *Rampke* v. *Beuhler,* 203 id. 384; *Weber* v. *Adler,* 311 id. 547; *Kohlbrecher* v. *Guettermann,* 329 id. 246.) When the parties to a contract have reduced it to writing, the written instrument is presumed to include all the terms of the contract, and evidence is not admissible to contradict, enlarge, explain or

modify the writing. It must speak for itself. A contract for the sale of land must definitely point out the particular land to be conveyed or must furnish the means of identifying it with certainty. If the description of the land is uncertain, so as to require parol evidence to locate the particular parcel of land to be conveyed, specific performance cannot be decreed. Where the description contains a patent ambiguity, one which appears on the face of the writing, the uncertainty cannot be cured by extrinsic evidence. (*Doyle* v. *Teas,* 4 Scam. 202; *Fisher* v. *Quackenbush,* 83 Ill. 310.) All the cases cited in this paragraph to sustain the rules announced are cited in *Kopprasch* v. *Satter, supra,* and a number more. The rules themselves are firmly established and well recognized. In accordance with them the court could not properly grant to the appellant the relief prayed, of a conveyance of 1013 acres. The contract says nothing about 1013 acres. It mentions 1080 acres and 1000 but not 1013 acres. Neither does it describe the 1080 or the 1000 acres. It does say that the undersigned, the Glen Flora Company, will work out a plan with Goldberg and with such persons to whom portions of the land were sold, so that approximately 1080 acres may be included in one sale as a separate entity from the remaining lot and approximately 9100 acres being included in a separate sale, each, however, to net the sum designated. Here is no description of any particular tract of 1000 acres or of 1080, or of any area between the two. It is like the case of *Hamilton* v. *Harvey, supra,* in which the description was, "one-third interest in five acres located near said works," a plow factory. The vendor owned five acres located near the plow factory, but there was nothing in the description which pointed out that particular five acres. So in *Wetmore* v. *Watson,* 253 Ill. 88, a contract whereby the first party agrees, in case he shall inherit by will "the lands or real estate" of a certain person, to deed to the second party 100 acres of said land or real estate situate in

Fayette county, Illinois, does not describe sufficiently the land, where the person referred to owned 600 acres of land in Fayette county. In *Hogan* v. *Orr,* 341 Ill. 58, in holding that "about 5 acres cor Bronse & Eliz Peoria Ill." was an insufficient description to justify a decree for specific performance, the court, assuming that the language meant "corner Bronse and Elizabeth streets," said that these words implied an intersection of those streets, resulting in at least two, and possibly four, corners, and no clue is expressed as to which corner is meant, the area is not definitely stated, and there is no reference whatever to ownership, occupation or any other fact which would make the description apparently definite and by which it could be applied to a specific piece of property. It was therefore held that the description contained ambiguity apparent on the face of the writing and that such ambiguity could not be cured by extrinsic evidence—citing cases in support of this decision. Unless a contract to convey land describes it with such certainty that from the writing itself a deed can be drawn conveying the property intended, or furnishes the means of identifying it with such certainty that from it a surveyor, by the aid of extrinsic evidence, can locate the property, it cannot be specifically enforced. *Weber* v. *Adler, supra; Heroux* v. *Romanowski,* 336 Ill. 297.

Not only is the description imperfect but the terms of the contract are equally indefinite. It is understood, the contract says, that the Glen Flora Company will work out with Goldberg, and with such persons to whom portions of the land were sold, the plan, so that approximately 1080 acres may be included in one sale as a separate entity from the other lot, and approximately 9100 should be included in a separate sale. The persons to whom portions of the land were sold could be identified by parol evidence, because the language of the contract gives the means of identifying them: "persons to whom portions of the land were sold." This includes Marks, Ray, Briskin and the

owners of the 100 lots which Goldberg had sold. This provision of the contract implies that a plan is to be agreed upon in the future to be worked out, which, we assume, means agreed on between the Glen Flora Company on the one hand and Goldberg and the various persons who had purchased portions of the property on the other. This plan is not defined in the contract with Goldberg but is left to be settled by agreement in the future among the persons named.

The terms and conditions of the sale of the two tracts are no more definite than the description of the two lots or the details of the plan to be adopted for their separate sale. These terms and conditions, the contract says, "shall be along the lines set forth in a contract between one George Marks and one M. R. Ray; that is to say, we will apply all moneys received from Briskin or any other source towards the first payment on the whole ten thousand (10,000) acres, and if the sum received from Briskin, Ray, or any other person, together with the commissions that you are entitled to thereunder, is sufficient to pay for the one thousand (1000) acres, then you are to receive a deed for the 1000 acres without further payment and subject only to the remaining amount of mortgage or notes; it being the intention that we are only to receive ninety dollars ($90) per acre net, fifteen dollars ($15) per acre cash and seventy-five ($75) per acre by way of first and second mortgages." This, of course, does not refer to any past contracts but to future contracts. The language is, "the terms and conditions shall be," and the meaning is the same as the language of the first paragraph, the 10,180 acres "is to be sold." The terms and conditions of sale "shall be along the lines set forth in a contract between one Marks and one Ray" is itself ambiguous. What does "along the lines set forth" mean? It certainly cannot mean "identical with," for the Marks-Ray contract required the payment of $184,187 by Ray to Marks on January 2, 1926,

which was already past. It may have meant in the minds of the parties "similar to," but in that case who would decide whether the terms and conditions were similar or not? And if the parties did not agree, by what means could a court determine what either party had in his mind at the time of signing this document? The letter attempts to define what is meant by terms and conditions along the lines set forth in the Marks-Ray contract by the remainder of the language in the paragraph, and the appellant contends that it not only mentions the consideration for the 1000 acres or the 1080 acres, but expressly shows that the consideration was paid and on the delivery of the letter Goldberg was entitled to a deed for the land. In its argument it calls attention to the fact that the whole of Volusia tract 3 is to be sold for $100 an acre, and then to the statement in the third paragraph, "the commissions that you are entitled to thereunder," as an admission that Goldberg at the date of the letter was entitled to $10 an acre commission on the whole tract. It is clear that the "commissions that you are entitled to thereunder" refer to commissions earned upon sales made of the 9000 acres and the 1080 acres after the date of the letter by reason of the resolution referred to in it that the 10,180 acres are to be sold at $100 an acre. Marks had defaulted. Ray had defaulted. Briskin had notified Pritzker that he was unable to pay, and it was not expected that any of those contracts would be carried out, and this letter to Goldberg and the acceptance of its terms by him looked to the future and not the past.

The last clause of the contract provides that the Glen Flora Company and the ultimate purchasers will work out the details of the apportionment of mortgages, release clauses, etc. These are mere details to be finally agreed upon by the vendor with the purchasers. If a decree for specific performance should be rendered, how can the court

decree what the Glen Flora Company must do under this provision of the contract? Though a contract in writing to convey real estate may clearly and definitely describe the property agreed to be conveyed, it cannot be specifically enforced if it does not give an absolute right to a conveyance without further negotiation thereon. In case of the failure of the contract to provide for the dates of maturity and the terms of the mortgages required to be given by the purchaser he will not be entitled to a specific performance though he offer to pay the entire purchase price in cash, as the contract provides for the taking of mortgages, and the court will not make a new contract for the parties though a cash payment may be considered more beneficial to the vendor. *Westphal* v. *Buenger,* 324 Ill. 77; *London* v. *Doering,* 325 id. 589; *Peiffer* v. *Newcomer,* 326 id. 189.

The decree of the court was right for the reason that the conduct of Goldberg in becoming interested in the purchase of the property which it was his duty to sell was in violation of the fundamental principle of agency that where the agent is acting for himself adversely to the interest of his principal, he cannot act, either directly or indirectly, in the sale of the property of his principal which is within the scope of his agency, without the consent of his principal freely given, after full knowledge of every matter known to the agent which might affect the principal. If employed to sell, the agent may not become the purchaser, and if employed to buy he may not be the seller. It was also right because the contract sought to be enforced is so indefinite in its terms that it cannot be specifically enforced against the vendor.

The decree is affirmed.

*Decree affirmed.*