(No. 18147.—

Sven Alfred Olson *et al.* Appellees, *vs.* Charlotte Mary Forsberg, Appellant.

*Opinion filed October 25, 1928—Rehearing denied Dec. 6, 1928.*

Arthur H. Jones, and Harris F. Williams, (B. Blakeney Harris, of counsel,) for appellant.

George J. Dreiske, and West & Eckhart, (William L. Bourland, of counsel,) for appellees.

Mr. Commissioner Partlow reported this opinion:

Appellees, Sven A. Olson and Alma Olson, his wife, filed their bill in the superior court of Cook county against appellant, Charlotte Mary Forsberg, for the specific performance of a written contract for the sale of real estate. The master to whom the case was referred to take the evidence and report his conclusions recommended a decree as prayed. A decree was entered as recommended, and an appeal has been prosecuted to this court.

The evidence shows that appellant, a widow, seventy-nine years old, was the owner of a building in Chicago containing an upper and a lower apartment. She had lived in the upper apartment for thirty years. She had a son, E. W. Forsberg, fifty-two years old, who was living with her at the time the contract in question was signed, but he had not lived with her for several years prior thereto. The building had been damaged by fire. The damage had not been repaired but the loss had been adjusted at $2000. Appellant claims that because of this fire she was very nervous and hysterical and had lost considerable sleep. Some

time prior to October 20, 1923, A. F. Burgeson, a real estate broker, had asked appellant to put a price on her property, and she had fixed the price at $12,000. She claims she never employed him to find a purchaser, but the evidence shows he had taken several parties to look at the property. On Saturday afternoon, October 20, 1923, Burgeson went to appellant's home and told her and her son that he had a prospective buyer for the property. Appellant and her son testified that about three o'clock on that day she went to the home of a friend, where she remained until about ten o'clock on Monday morning, October 22, 1923. The son testified that after she left home Burgeson brought Olson to look at the property and the son took them through the building. Burgeson and Olson returned about six o'clock with Mrs. Olson, and the son showed them through the building. Olson testified to these two visits and the inspection of the building. He testified that appellant was present on both occasions. He talked with her about buying the property, and she told him the terms substantially as specified in the written contract. After the building was inspected Burgeson took appellees to his office and a contract of purchase was prepared and signed by appellees, who gave Burgeson $300 as earnest money. The contract fixed the purchase price at $9800, of which $2000 was to be in cash. There was to be a principal indebtedness of $5000 due in 1928, and the balance of $2800 was to be paid at the rate of $50 per month and was to be secured by a second trust deed on the property. On Monday morning, October 22, 1923, Burgeson took the contract to the home of appellant, and her son and Buregson asked her to sign it. The son told his mother about appellees having looked at the property on the previous Saturday, told her the terms of the contract and urged her to sign it. He told her it was a good sale and she would be sorry if she did not sign. She refused to sign, giving as her reason that she had no glasses and that the contract had not been read

to her. Carl J. Johnson, who had been a neighbor and friend of appellant for twenty-five or thirty years, had been employed by her to repair the damage to the building and was working on the building at the time. He went up-stairs where the parties were talking. He examined the contract and told appellant it was a standard contract and he could see nothing wrong with it; that she was to get a mortgage for $5000 and was to receive $50 a month and $2000 in cash; that he thought it was a fair deal and he did not see why she could not accept it. She still refused to sign, and Johnson went down-stairs and she accompanied him, where she remained about three-quarters of an hour. Her son then went after her and she went up-stairs with him. Burgeson testified that when she came up-stairs she said she would sign the contract. She sat down at the table and asked her son whether she should make a dot or sign her full name. The son took hold of her hand and directed her movements while the name was signed. He testified that after his mother came up-stairs he was sitting at a table and she was walking the floor. He got up from the table and told her to sit down. She sat down and he took a fountain pen out of his pocket, put it in her hand and told her she had better sign the contract. He asked her if she wanted to make a cross, and she said she did not. He then guided her hand and she signed the contract. He testified she could not sign her name in full. She could write a signature which might be read as Mary Forsberg but she could not write the name Charlotte. He testified that he urged her to sign; that he assumed she knew what she was doing; that she was mentally competent to appreciate what she was doing; that she knew this was a contract of sale; that she was nervous, hysterical and had been crying; that he wanted to get her out of this apartment into a steam-heated flat, where she could be more comfortable. Burgeson testified that after the contract was signed appellant asked him to secure a small apartment for her

where she could live; that they talked about her having fallen down-stairs and about the danger of her living in this apartment alone and trying to take care of the furnace in the basement.

Appellant testified that she was nervous and had lost sleep; that neither Burgeson, Johnson nor her son explained the terms of the contract to her; that she refused to sign because she had no place to go; that she was not willing to sell for less than $12,000 or on payments less than $100 per month; that her son did not tell her the price was fair and she had better sign or she would be sorry; that she did not take the pen in her hand; that the son had it in his hand and held her hand; that she never touched the pen that she remembered.

Olson testified that he saw appellant a day or two after the contract was signed. She told him she had signed the contract and asked him if he was going to live in the house. He told her he would not occupy it until spring. She asked him if she could stay there until spring, and he told her she could. He asked her about the rent, and she said the downstairs rented for $50 per month. She said she would put a mortgage on the place for $5000. She had employed Johnson to make the repairs and recommended him to Olson, who was to pay him. She showed him how he could build a garage in the rear and have more income from the premises. He told her he had $1500 in bonds which he would like to apply on the $2000 payment instead of paying cash, and she said it would be all right. She testified she did not remember this conversation with Olson.

The master found that when the contract was presented to appellant for her signature she refused to sign it and persisted in such refusal for about an hour and a half, during which time Burgeson and her son used every possible persuasive effort to induce her to sign; that she continued in her refusal, and the son held her hand and directed her movements while her signature was affixed; that appellees

were not chargeable with any act of persuasion or undue influence prior to the execution of the contract; that the son and Burgeson were acting in good faith and for the best interests of appellant; that the terms of the contract were the terms and conditions under which appellant had directed Burgeson to sell the property; that the contract was fully explained to her and no undue influence was exercised over her; that the contract represented a transaction which was in all respects fair to her and met her approval.

Appellant insists that the evidence does not show that she freely and voluntarily and with full knowledge of its terms executed the contract, and that a court of equity should not grant specific performance of a contract thus obtained. Appellees contend that the evidence shows that she entered into the contract freely and voluntarily and with full knowledge as to its terms; that she later by her acts ratified it and now seeks to escape its provisions because she has obtained a better offer for her property, and therefore the contract should be specifically enforced.

From the facts as above recited it is apparent that it is a close question, under the evidence, whether appellant freely and voluntarily signed the contract and whether she ratified it after it was signed. Whether she did sign freely and voluntarily and whether she later ratified the contract are questions of fact depending upon the credit to be given to the testimony of the various witnesses. If this were the only question in the case it would be necessary for this court to consider the evidence on this point in detail. This is unnecessary, however, for the reason that the decree will have to be reversed on other grounds.

Specific performance of a contract rests in the sound discretion of the court, to be determined from all of the facts and circumstances of each case. (*Stephen* v. *Clark,* 305 Ill. 408; *Miller* v. *Clark,* 301 id. 273.) If a contract is freely and voluntarily executed and its terms are clear and specific and it is free from objections, specific per-

formance will be decreed as a matter of right and not as a matter of favor. (*Allen* v. *Hayes,* 309 Ill. 374; *Woodrow* v. *Quaid,* 292 id. 27; *Ullsperger* v. *Meyer,* 217 id. 262.) The terms of the contract must, however, be clear, certain, and free from ambiguity and doubt. The terms must make the precise acts which are to be done clearly ascertainable. (*Moore* v. *Machinery Sales Co.* 297 Ill. 564; *Gronowski* v. *Jozefowicz,* 291 id. 266; *Davier* v. *Kaiser,* 280 id. 334.) The contract, if it is enforced, must be enforced according to its terms or not at all. A court has no authority to compel a party to do something different from what he agreed to do by his contract. *Cable* v. *Hoffman,* 273 Ill. 272; *Rampke* v. *Beuhler,* 203 id. 384.

This contract does not comply with the above rules of law. Its terms are not clear, certain, and free from ambiguity and doubt. The consideration stated is $9800, of which $2000 was to be in cash, $2800 was to be secured by a second trust deed on the property, payable $50 per month, and the conveyance was to be subject "to a principal indebtedness of $5000, with interest at six per cent per annum, payable semi-annually, principal amount due 1928." This was the only recital in the contract as to the $5000. There was no encumbrance on the property when the contract was executed. There was no provision in the contract as to the nature of this principal indebtedness— whether it was to be a part of the purchase price, whether it was to be evidenced by a note or mortgage, who was to execute the note and mortgage, to whom they were to be payable, or who was to be responsible for their payment. There is a material difference between a principal indebtedness as specified in this contract, and a mortgage or trust deed securing an indebtedness. There is also a material distinction between buying property subject to a mortgage and assuming a mortgage which is already on the property and agreeing to pay the same. If a note and mortgage were executed by appellant she would be personally liable

for their payment. If they were executed by her and appellees assumed their payment appellees would also be liable therefor. If they were executed by appellant and the conveyance was made subject to the mortgage but appellees did not assume them, appellees would not be personally liable. If they were executed by appellees, appellant would not be liable for their payment. The bill alleged that a part of the purchase price was to be paid by appellees assuming a mortgage which was to be executed by appellant. This allegation was not in accordance with the terms of the contract for the reason that the contract did not provide that the mortgage was to be executed by appellant. Leave was given appellees to amend the bill by striking out this allegation with reference to appellant executing the mortgage, but the amendment was never made. The decree found that the $5000 was to be secured by a first mortgage, but it was silent as to who was to execute the mortgage, when it was to become due, or any other facts with reference to it.

In *Westphal* v. *Buenger*, 324 Ill. 77, the contract in some respects was quite similar to the contract in question. It provided for the assumption and execution of mortgages, but it was not specific as to the terms of the mortgages or the dates they were to become due. It was held that where a contract for a conveyance provides that mortgages shall be given for the greater part of the purchase price but the contract is uncertain in its terms with reference to the due dates and terms of the mortgages, the purchaser will not be entitled to specific performance notwithstanding the offer to pay the entire purchase price in cash, for the reason that the contract provides for the taking of mortgages, and the court will not make a new contract for the parties even though a cash payment may be considered more beneficial to the vendor; that the court will only enforce the specific performance of a contract according to its expressed provisions, which must be specific, clear and unambiguous; that a written agreement of sale which does not purport to give

an absolute right without further negotiations thereon can not be specifically enforced. The contract in the case before us falls within the rule above announced, and the contract was so indefinite and uncertain in its terms that appellees were not entitled to a decree for specific performance.

The contract provided that time should be of the essence of the contract; that a certificate of title or merchantable abstract or merchantable title guaranty policy should be furnished by appellant within a reasonable time after the execution of the contract; that appellees or their attorney, within ten days after receiving such abstract, should deliver to appellant a note or memorandum in writing signed by them, specifying in detail the objections, if any, to the abstract of title, and if there were no objections to so state. All defects found in the title were to be cured in sixty days after notice thereof or appellees were to have the right to cancel the contract. Appellees had the right to take the title subject to defects provided they gave written notice of such election within ten days after the expiration of the sixty days and tendered performance. The evidence shows that four or five days after the contract was signed Burgeson went to the home of appellant and obtained from her an abstract of title and turned it over to the attorney for appellees. Burgeson received a letter dated November 14, 1923, from the attorney, in which it was stated that the abstract was not merchantable and that it would cost $65 to have it corrected by the Chicago Title and Trust Company. The letter did not specify in detail the objections to the title and was not sent within ten days after the abstract was received by the attorney, and therefore did not comply with the contract. After Burgeson received the letter he went to the home of appellant and talked to her son about the abstract not being acceptable but did not talk to appellant about it. He then ordered an abstract of title from the Chicago Title and Trust Company. There is no evidence that appellees ever notified appellant with reference to the

second abstract or that they ever gave her any notice as to what they desired to do with reference to accepting the title. Some time after receiving the second abstract, the exact time not appearing, Burgeson went to appellant's home and asked both her and her son to be at his office on December 3, 1923, to close the deal. These acts did not constitute a compliance with the contract, either as to the time of doing the acts or as to the acts themselves.

In *Miller* v. *Shea,* 300 Ill. 180, the contract required the vendee to return the vendor's abstract together with his objections to the title. It gave the vendee the option to waive such defects if the vendor failed to have them remedied within sixty days, provided the vendee notified the vendor of his intention to accept the title as shown. It was held that the vendor could not be put in default for not conveying the property until he was notified that the vendee had elected to accept the title, and such election could not be shown merely by filing a bill to compel a conveyance after a written demand had been made calling attention to the alleged defects and insisting that the vendor carry out his part of the contract.

In *Harris* v. *Eich,* 306 Ill. 303, a decree for specific performance was based upon the alleged failure of the vendor to furnish an abstract of title. It was held that the decree could not be sustained where it appeared that an abstract had been furnished by the vendor as required by the contract, but the vendee had not, though required by the contract, notified the vendor, in writing, of her acceptance of the title, or of her objections to the abstract, or of an election to waive objections to the title and take it as shown.

There is no evidence in this case of any communication between appellees and appellant after the first abstract was delivered by her to Burgson. There is evidence of verbal communications between Burgeson and the son of appellant. There is no evidence that either Burgeson or the son had any authority to act for or represent appellant in any man-

ner. It is not shown that appellant knew that the attorney for appellees had refused to accept the original abstract, or that such refusal had been made within the time required by the contract, or that appellees had received the second abstract of title, or had made any objections to it or had elected to accept the title as shown by the abstract. Before a person is entitled to the specific performance of a contract he must show that he is not in default, that the contract has been fully, fairly and in good faith performed on his part, that he has complied with its terms as far as possible, and that he is able, ready and willing to do the future acts provided for in the contract. (*Mitchell* v. *White*, 295 Ill. 135; *Bennett* v. *Burkhalter*, 257 id. 572; *Short* v. *Kieffer*, 142 id. 258; *Chicago Municipal Gas Light and Fuel Co.* v. *Town of Lake*, 130 id. 42.) Even though it be conceded, as contended by appellees, that the contract was freely and voluntarily entered into by appellant and that its terms were clear and certain, there is no evidence that she made any declaration of her intention not to carry out the contract prior to the date set for closing the deal. Under such a state of proof the burden was on appellees to show that they were not in default, that they had complied with the terms of the contract as far as possible and that they were able, ready and willing to do the future acts stipulated in the contract. There was no evidence to show these facts.

For the reasons indicated the decree will be reversed and the cause remanded, with directions to dismiss the bill.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded, with directions.*