(No. 34592.— )

CLARE A. SULLIVAN, Trustee, *vs.* JAMES W. BURKE *et al.* —(THOMAS E. SULLIVAN, JR., *et al.,* Appellees, *vs.* ELEANOR BELLAS *et al.,* Appellants.)

*Opinion filed September 18, 1958—Rehearing denied Nov. 24, 1958.*

PATRICK F. MURRAY, and McCARTHY, TOOMEY & REYNOLDS, of Chicago, (JOHN E. TOOMEY, and JOHN M. KAVENY, of counsel,) for appellants.

EMMET J. CLEARY, of Chicago, for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Cook County ordering the execution of the terms of a declaration of trust, directing specific performance of a

contract of sale executed by the trustee and distribution of the proceeds resulting therefrom. A freehold being involved, the appeal is properly directed to this court.

In May, 1932, pursuant to the terms of a written declaration of trust, James W. Burke took title to the real estate involved herein by a trustee's deed giving him full authority to deal with the premises the same as if he were the sole legal and equitable owner thereof. There is no evidence to show what, if anything, was done to develop the trust property between the years 1932 to 1943. In 1943, Thomas E. Sullivan, Sr., a real-estate man and one of the principal beneficiaries under the trust, corresponded with the trustee and another of the beneficiaries under the trust, advising them of certain tax delinquencies against the property and suggesting that the land be sold. On July 5, 1945, he secured an exclusive agency agreement from the trustee authorizing him to arrange for the sale of the land. As a result of the efforts of Sullivan, Sr., on February 13, 1946, the trustee executed a contract for the sale of the real estate to Clarence H. Kavanagh for the sum of $12,000. Insofar as the same is pertinent to the issues herein, this contract provided:

"Said purchaser has paid $500 as earnest money, to be applied on such purchase when consummated, and agrees to pay within 60 days after the title has been examined and found good, or accepted by him, the further sum of $11,500 * * * , provided a good and sufficient trustee's deed, conveying to said purchaser a good and merchantable title * * * shall then be ready for delivery. Merchantable title guarantee policy made by Chicago, Title and Trust Company shall be furnished by the vendor within a reasonable time, * * * . The purchaser * * * shall, within 10 days after receiving such abstract, deliver to the vendor * * * a note or memorandum * * * specifying in detail the objections he makes to the title, if any; or if none, then stating in substance that the same is satisfactory. In case material defects be found in said title, and so reported, then, if such defects be not cured within 60 days after such notice thereof, this contract shall, at the purchaser's option become absolutely null and void, and said earnest money shall be returned; notice of such election to be given to the vendor; but the purchaser may nevertheless elect

to take such title as it then is, and in such case the vendor shall convey, as above agreed; * * * ."

The $500 earnest money referred to in the contract was actually paid by Sullivan, Sr., received by the trustee and distributed by him, in part at least, to some of the beneficiaries under the trust. Kavanagh, named as purchaser in the contract, was the agent and nominee of Thomas E. Sullivan, Jr., and Raymond Sullivan, sons of Sullivan, Sr., and on March 1, 1946, assigned the contract to them. Sullivan, Jr., was engaged in the home building and remodeling business and was interested in purchasing the property for use in his business.

On March 12, 1946 Sullivan, Sr., pursuant to the authority given him in an exclusive agency agreement, ordered, and in April, 1946, received a letter of opinion from the Chicago Title and Trust Company that referred to an application for a title guarantee policy, which letter he delivered to an attorney, Joseph Sullivan. There is no evidence that this letter of opinion was brought to the attention of the purchasers although attorney Sullivan had been representing the purchasers on other matters at or about this time. It is conceded that no note or memorandum in writing signed by purchasers or by attorney Joseph Sullivan was given to the trustee notifying him of any defect in the title or that the title was unsatisfactory.

On July 1, 1946, a suit was filed in the superior court of Cook County by one Leonard E. Steele against the trustee and Sullivan, Sr., claiming that Steele and Sullivan, Sr., were partners in the development of the real estate in question and praying for injunctive relief to prevent Sullivan, Sr., or the trustee from alienating the property and for an order protecting Steele's alleged proportionate share in the premises. During the pendency of this lawsuit, Sullivan, Sr., died in August, 1947, and his widow and heirs, including Sullivan, Jr., were substituted as parties defendant. The Steele lawsuit resulted in an order finding the issues

for the defendants and dismissing the cause for want of equity. On appeal this decision was affirmed. *Steele* v. *Sullivan,* 337 Ill. App. 290.

During the pendency of the Steele lawsuit neither party to the present case took any action to consummate or cancel the contract for sale of the real estate. The attorney for Sullivan, Jr., took the position that the Steele lawsuit had the effect of clouding the title to the real estate thereby preventing the trustee from delivering good title thereto. He so informed the trustee by letter dated February 6, 1948, and further advised him that closing the contract for sale depended upon the outcome of the Steele lawsuit.

Appellees contend that the letter of opinion or application for a guarantee policy ordered by Sullivan, Sr., pursuant to his agency and option agreement was not in compliance with the contract of sale in that vendor was required to furnish a merchantable guarantee policy or abstract to the purchasers, and that there was no evidence that the letter of opinion was ever seen by purchaser, Sullivan, Jr., or by attorney Joseph Sullivan at a time when he was representing Sullivan, Jr., in the purchase of this real estate. However, the record shows that the only reason that the attorney for the purchasers ever gave for not consummating the deal was the filing of the Steele suit on July 1, 1946, which he said had the effect of clouding the title and preventing Dr. Burke from being able to deliver good title. At no time did the purchasers or their attorney give as a reason for not closing the deal the failure of the trustee to furnish an abstract or guarantee policy.

In March, 1953, Clare Sullivan, as trustee under the will of her deceased husband, Thomas E. Sullivan, Sr., filed her complaint in chancery praying for a decree ordering the sale of the real estate and distribution of the proceeds therefrom. Sullivan, Jr., who was made a party defendant because of his interest under the contract of sale, filed a counterclaim for specific performance of the contract.

Proper answers and replies were filed by the respective parties and no question is raised on the pleadings. The cause was referred to the master in chancery who, after hearing evidence, recommended allowance of certain sums advanced for taxes and costs by two of the beneficiaries under the trust agreement, recommended that the counterclaim for specific performance be disallowed, and reported that the premises should be sold according to the terms of the trust and distribution made of the proceeds. Sullivan, Jr., filed exceptions to the master's report, which exceptions were sustained by the trial court and a decree entered ordering specific performance of the contract of sale. From this decree the defendant beneficiaries have appealed to this court. The answers of several of the defendants, who were owners of a beneficial interest in the trust, denied that the complaint in chancery filed in the superior court of Cook County by Leonard E. Steele against Sullivan, Sr., had the effect of clouding the title to the real estate involved, and they admitted that more than 20 years have elapsed from the date of the creation of trust No. 101 and alleged that Eileen B. Burke, as successor trustee, and these defendants are willing to sell the premises at a public or private sale. They admitted that certain monies are owing to the plaintiff for advances made by Thomas E. Sullivan during his lifetime and likewise that Eleanor Bellas, one of the owners, is entitled to reimbursement for monies advanced by her. Further answering they stated that the trust agreement provided that if any property remained in the trust 20 years from the date of the trust agreement it should be sold at public sale by the trustee on reasonable notice, that Eileen B. Burke, as trustee, has obtained offers from many persons, one of which was from the Chicago Construction Company, to purchase the real estate described in the amended complaint at a price of $80,000.

These same defendants filed a counterclaim against Sullivan, Jr., *et al.*, defendants, and alleged that they are the

beneficial owners of parcel I, that prior to February 13, 1946, Thomas E. Sullivan, one of the beneficiaries under the trust, was engaged in the business of buying and selling real estate on his own account and as agent for others, that for many years prior to said date Thomas E. Sullivan was the trusted agent and business advisor of James Burke in reference to parcel I, that Thomas E. Sullivan, Sr., knew that James Burke and the beneficial owners of said real estate all relied implicitly upon him as their agent and friend for advice and counsel and that by reason of such relationship James Burke had placed parcel I in the hands of Thomas E. Sullivan for sale as agent, that while Thomas E. Sullivan was acting as agent of James Burke, and while efforts were being made to sell parcel I at the best obtainable price, Thomas E. Sullivan stated and represented to James Burke and to the beneficial owners of parcel I that he had procured a purchaser who would pay all the property was worth, and that it would be advisable for the trustee and the beneficial owners to make such sale; that James Burke, relying on the statements of Thomas E. Sullivan, and on his advice, was induced to execute a real estate contract with Clarence Kavanagh, Jr., to sell parcel I for $12,000.

These counterclaimants further alleged that they were not informed that Thomas E. Sullivan, without the knowledge of James W. Burke, was himself the real purchaser of said property and that the said Clarence Kavanagh, Jr., was in truth the person selected by Thomas E. Sullivan to take title for the benefit of Thomas E. Sullivan; that the premises were worth and known to Thomas E. Sullivan to be worth far more than the price which the nominee agreed to pay and it was further alleged by them that Leonard E. Steele, purporting to be a joint adventurer with Thomas E. Sullivan in the property, commenced an action against him in the superior court of Cook County to enforce a so-called joint adventure or partnership arrangement in which it was charged that Thomas E. Sullivan was purchasing the prop-

erty for the use and benefit of himself and Leonard E. Steele; that therefore Thomas E. Sullivan was acting dishonestly and fraudulently in obtaining the property from the beneficiaries of the trust at a price much less than he knew could be procured from other persons. It was further alleged that trust No. 101 provides that the trustee will deal with the real estate only when authorized to do so in writing by a majority of the persons as may be beneficiaries of the trust at that time; that Thomas E. Sullivan, being a beneficiary in trust No. 101, well knew the terms and provisions of the trust agreement and knew that the trustee had no authority to enter into a contract until he was so directed by a majority of the persons who were beneficiaries and that he had obtained no such directions. And it is finally alleged that the failure of Kavanagh and his assignees to perform under the contract for an unreasonable period of time constituted an abandonment of said contract and estops them from demanding performance, and that counterclaimants, being beneficiaries, offered to do equity and to return the $500 deposited with James Burke to those entitled to the same.

Sullivan, Jr., *et al.*, filed an answer to this counterclaim, in which they stated that the contract for the sale of the real estate is a valid one and was assigned to them on March 1, 1946; that at all times they have been and are now ready, willing and able to perform and have made a tender thereunder and they prayed that the contract assigned to them be enforced. They further denied any wrongdoing on the part of their father, Thomas Sullivan, or that there was any conspiracy to defraud the beneficiaries under the trust. The record discloses that on March 12, 1946, Sullivan, Sr., under authority given him in the exclusive agency and option agreement, ordered an opinion of title from the Chicago Title and Trust Company and delivered the same to his attorney, Joseph Sullivan, in March or April of 1946. There is no positive evidence that this letter of

opinion was brought to the attention of Sullivan, Jr., *et al.*, by Joseph Sullivan, the attorney for Sullivan, Sr. However, Joseph Sullivan had been the attorney for Sullivan, Sr., in several matters, including the Steele suit and tax foreclosures in the trust property. And the same Joseph Sullivan appeared as a lawyer for Sullivan, Jr., two years later after the Steele suit was dismissed. He also represented Raymond and Thomas Sullivan in connection with the probate of their father's estate in August, 1947, and he represented the two boys in the Steele suit after their father's death.

Joseph Sullivan testified that Sullivan, Sr., delivered the opinion of title to him in March or April of 1946, but that it was used in connection with the tax foreclosure proceedings.

Thomas Sullivan, Jr., while testifying, seemed determined not to know anything about the opinion of title, either the one of 1946 or the one ordered by Joseph Sullivan in his behalf in 1948. Quoting from the testimony— "Sullivan: 'I never ordered a letter of opinion on this property. I never saw such a letter. From 1947 down to the present time I have never seen a letter of opinion on parcel I. I never talked with Joseph Sullivan with reference to the property.' The Master: 'But the question was you meant you had never seen the letter of opinion.' The Witness: 'That is right.' Mr. Toomey: 'But you knew your lawyer had one.' Answer: 'According to the letter he said he had one.'" Apparently he was unwilling to rely upon his lawyer's report that he had received such an opinion of title.

No note or memorandum in writing signed by Sullivan, Jr., *et al.*, or their attorney, Joseph Sullivan, was given to James Burke, the trustee, notifying him of any defect in the title, or that the title was not satisfactory. But as we have heretofore indicated, Sullivan, Jr., and his attorney did write Burke to the effect that they could not proceed

with the contract because of the fact that the Steele suit was a cloud upon the title. It occurs to us that this litigation was not a cloud upon the title of the property, but was simply a cloud upon the bargain that the Sullivan boys had obtained from their father. If Steele should prevail in his litigation, then he would share in the profits of this adventure. The extent of his participation in the profits was a matter that only the future would reveal, and Sullivan, Jr., *et al.,* wanted to know before continuing with the contract the extent of that participation.

On June 14, 1948, Joseph J. Sullivan in a letter to James Burke advised him that the trial of the case of Steele v. Sullivan had been disposed of and that all issues had been found in favor of the defendants. Also on July 23, 1948, Joseph Sullivan by letter advised Bellas, one of the owners of the land in question, that he had ordered an opinion of title down to the current date; that the purchasers would be ready to close on the basis of the contract providing for a purchase price of $12,000, and in that letter he stated that he assumed that James Burke had secured the consent of the beneficiaries prior to the execution of the contract of sale.

On July 30, 1948, Joseph Sullivan wrote his client, Thomas E. Sullivan, Jr., that the letter of opinion covering the Burke property had been delivered to him and showed good title subject to taxes and that he could make arrangements to close the deal. On November 11, 1948, Thomas E. Sullivan, Jr., delivered two uncertified checks totalling $11,500, payable to the law firm of Joseph J. Sullivan, which were to be used in the purchase of the Burke property. Thereupon, Joseph J. Sullivan, on November 15, 1948, advised James Burke by letter that Thomas E. Sullivan, Jr., had delivered to him checks aggregating $11,500, representing the balance due on the sale of the Burke property and with the letter he enclosed a deed for execution by James Burke, and he said in the letter that he would

record it and have an examination of title made by the Chicago Title and Trust Company to cover the recordation of the deed. The two checks totalling $11,500, made payable to the law firm, had endorsed on the back thereof the following: "Deposit in escrow as per contract dated 13 February '46 for purchase of forty acres in Northbrook from Burke Estate." On November 22, 1948, Joseph Sullivan wrote to Bellas that his clients were prepared to consummate the deal and that in view of Burke's poor health he asked Bellas to take over on his behalf, and then on April 26, 1949, Joseph Sullivan wrote to James Burke that he was holding the funds of his clients and stated that if Burke was not to consummate the deal he would like to have him return the $500. Then on May 6, 1949, Joseph Sullivan again wrote to Burke and stated that due to the expense of the litigation involving parcel I in connection with the Steele suit that his clients were unwilling to accept the return of the earnest money and cancelling the contract. In May of 1949 Mrs. Burke, the wife of James W. Burke, trustee, offered to return the $500 to Thomas E. Sullivan, Jr., but he refused to accept it.

The record further shows that there was a stipulation entered into by the parties that if C. P. Bellock, a licensed real-estate broker of the State of Illinois, and a senior member of a society of residential appraisers, was called to testify he would give his opinion that the reasonable market value of the property involved, as of February 26, 1954, was $2500 per acre for the east 20 acres and $1850 per acre for the west 20 acres.

The master did not find that the Sullivans were guilty of any fraud or overreaching. There was no proof advanced sustaining such a charge. The property involved was in distress. There were 14 owners of a small interest, not of sufficient size to justify much concern in the future of the property. It produced no income and tax delinquencies were ever present. It required activity on the part of

one or the other of the beneficiaries to rescue the property from tax sales. Sullivan, Sr., evidently felt that the property would increase in value. Steele evidently thought that Sullivan would include him in on what looked like a profitable adventure. Instead, the sale contract with Burke was made with a nominee who assigned the same to the two sons of Sullivan, Sr. Just why a nominee was used is not explained by the nominee who testified or by the others.

There is somewhat of a conflict in the testimony of Sullivan, Jr., and Mrs. Burke as to what was said in the several attempts made by Sullivan, Jr., to secure Mr. Burke's signature to the deed. Mrs. Burke testified that Burke became ill in September, 1947, and was seriously sick from that day until his death. He had high blood pressure, arteriosclerosis and nephritis. In February, 1948, she met Thomas Sullivan in her home when he stated that he wanted to pick up the deed that Joe Sullivan, his lawyer, had mailed to Dr. Burke to sign. He said he was going to put the money in escrow upon the receipt of the deed. Mrs. Burke's testimony was as follows: "He said: 'You will get your $11,500.00', and I said, 'Well, there is lots of expenses to come out of there, isn't there?' And he said, 'Yes' and I said, 'Well, suppose you mail me a letter telling me just what is to come out of it.' He said, 'All right, I will do that.' A month later he and his brother came back and I told him, 'I have received your letter with all the expenses attached to it, and figuring it out, there is so little left, I wouldn't dare show it to the doctor for fear he would have a heart attack.' He said, 'Don't show it to him; just have him sign it.' I said, 'Well, I would not do that.' And I saw Tom Sullivan, Jr., again in April, 1949, and he said the next move would be the Supreme Court. I told him that the doctor was sick and he hadn't done anything more about it. That was the last conversation I had with either of them. I talked to Sullivan, Jr., by telephone in May of 1949. I called him in Glenview. I told him I had

received a letter from Joe Sullivan saying that if we didn't intend to complete the contract, to return the $500.00 deposit. I told him that after receiving the letter I had talked to Mr. Bellas and that Mr. Bellas had said that he was willing to put up the money. And he got very upset and said, 'No, no; that isn't what I want. I don't want it!' He further said, 'Attorney Sullivan had no right to do that.' I also told him on one of the trips, 'Well, if you had the property to sell, you yourself wouldn't sell it at that price. There would be nothing left when we get through with it after that list of expenses that are against it. You wouldn't sell that property yourself at that price.' "

The master did not choose to find that there had been an abandonment of the contract when Sullivan wrote that he would not conclude the deal until the Steele litigation was at an end. This he could very well have done. (*Gibson v. Brown,* 214 Ill. 330; *Miller v. Gordon,* 296 Ill. 346; *Vincent v. McElvain,* 304 Ill. 160). It is not necessary, however, to rest our decision on whether the vendees ever saw the letter of opinion of the Chicago Title and Trust Company in 1946, because after the termination of the Steele suit the attorney for the purchasers ordered a letter of opinion on July 23, 1948, from the Chicago Title and Trust Company, and upon its receipt on July 31, 1948, wrote one of the vendees that the letter of opinion showed good title subject to taxes and that he should make arrangements to close the deal.

We recently stated in *Horan v. Blowitz,* 13 Ill.2d 126, on page 131: "It is elementary that neither specific performance may be decreed nor forfeiture declared until such time as the moving party has himself complied with all the provisions of the contract, [citations] and where time is of the essence and both parties are in default upon the stipulated date, each is prevented from enforcing its terms and a rescission occurs. *Baston v. Clifford,* 68 Ill. 67;

*Kellogg* v. *Kartte,* 323 Ill. 443; *Bishop* v. *Newton,* 20 Ill. 175."

Admittedly on July 30, 1948, the opinion of title covering the Burke property showed good title subject to taxes, and under the contract of sale purchaser had 60 days to pay the further sum of $11,500 to the seller "provided a good and sufficient trustee's deed, conveying to said purchaser a good and mechantable title * * * shall then be ready for delivery." Although the contract recited that time was of the essence, purchasers did not offer to pay the balance of the purchase price within the 60-day period required in the contract of sale but on the contrary waited 105 days and then advised seller that they would pay the purchase price *only* on condition that Dr. Burke would execute a deed to the purchasers and deliver it to their attorney who would be the self-appointed escrowee in the transaction. The deed would have to be recorded, a later date report on title ordered, and upon its receipt purchasers' attorney would remit the balance of the purchase price. Under the contract of sale, the seller had no obligation to execute and deliver his deed to the purchasers without payment of the purchase price, nor could he be expected to deliver a deed without some definite understanding of the amount purchasers' attorney would deduct from the balance of the purchase price on account of taxes or other items of expense that were not specified in the so-called escrow arrangement. Under the real-estate contract of sale the payment of the purchase price and the delivery of the deed were to be made concurrently. (*Macy* v. *Brown,* 326 Ill. 556, 563; *Cobb* v. *Willrett,* 313 Ill. 92, 94; and *Neidhardt* v. *Frank,* 325 Ill. 596, 602.) Purchasers had no right to impose conditions not contained in the contract of sale and by attempting to do so they failed to show that they had complied with the terms of the contract of sale as far as possible and that they were ready, able and willing

to do the future acts required under the contract. *Olson* v. *Forsberg*, 332 Ill. 266, 274; *Brown* v. *Jurczak*, 397 Ill. 532; *Mitchell* v. *White*, 295 Ill. 135, 140; *Short* v. *Kieffer*, 142 Ill. 258, 266.

But appellees rely on *Forest Preserve Dist.* v. *Emerson*, 341 Ill. 442, which holds that the furnishing of indicia of title by appellants was a condition precedent to any act on their part and that purchaser's application for a guarantee policy or a preliminary letter of opinion did not relieve the seller of his obligation in this respect under the contract.

Appellees, however, overlook the fact that, when the purchasers failed to order a letter of opinion, guarantee policy or an abstract from the Chicago Title and Trust Company, their attorney elected to do so. Admittedly the opinion showed good title in vendor subject to taxes and under the contract of sale purchasers agreed "to pay within sixty days after the title has been examined and found good, or accepted by him, the further sum of Eleven Thousand, Five Hundred and no/100 Dollars ($11,500.00)." Purchasers did not comply with the time provisions contained in the contract nor did they at any time offer to pay the balance after the title was examined and found "good" by their attorney. The fact that purchaser's attorney ordered the report on title is of no consequence. No one would expect the seller to duplicate the cost and order another opinion from the Chicago Title and Trust Company which could in no way find the title different from what the title company had already reported, which was admittedly satisfactory to vendees' attorney.

Appellees urge that the contract of sale required seller to actually furnish a guarantee policy of the Chicago Title and Trust Company and that the preliminary letter of opinion or the application for a guarantee policy did not comply with the contract. This argument ignores the fact that purchasers' own attorney ordered exactly what he wanted at seller's expense, and in his opinion it was sufficient

to consummate the sale but according to his own terms. Purchasers are in no position now to urge that they wanted something that their attorney did not think was necessary in 1948.

After a careful analysis of this record and the applicable law, we are convinced that the master in chancery reached the correct result in this case, namely, that the counterclaim of Thomas E. Sullivan, Jr., and Raymond G. Sullivan for specific performance of the contract be disallowed and that there be a sale and distribution. Accordingly the decree entered herein will be reversed and the cause remanded, with directions to dismiss appellees' counterclaim and for a sale of the involved premises and distribution in accordance with the master's findings.

*Reversed and remanded, with directions.*