FRANCES E. PEIFFER, Appellee, *vs.* THOMAS E. NEWCOMER *et al.* Appellants.

*Opinion filed June 22, 1927.*

1. CONTRACTS—*all terms of written contract must be in writing.* A written contract is one which is all in writing, so that all its terms and provisions can be ascertained from the instrument itself.

2. SPECIFIC PERFORMANCE—*terms of a contract must be clear, definite and certain.* To entitle a party to the specific performance of a contract the terms must be clear, definite and certain, and it is not enough that some kind of contract exists between the parties, but it must be so definite and certain in all its terms that the court can require the specific thing contracted for to be done.

3. SAME—*agreement subject to further negotiation cannot be specifically enforced.* An agreement in writing which does not purport to give an absolute right without further negotiations thereon cannot be specifically enforced.

4. SAME—*when contract is not consummated.* A contract for the sale of real estate is not consummated so as to entitle a purchaser who signed it to specific performance where it was never signed by the other party but was mailed to her and referred to her attorney, who suggested changes in the terms so as to make the initial payment in installments in order to avoid an income tax,

where the proposed changes were never communicated directly to the purchaser and were never drawn up but were suggested in a letter of the attorney to another party who had no authority to make or accept the changes for either party and where nothing further was done to close the transaction.

APPEAL from the Superior Court of Cook county; the Hon. WALTER P. STEFFEN, Judge, presiding.

COBURN, KEARNEY & COBURN, for appellants.

S. J. BLUMENTHAL, and TOWNLEY, WILD, CAMPBELL & CLARK, (CHARLES V. CLARK, FREDERICK D. CARROLL, and FRED A. BOWES, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

On October 30, 1925, Thomas E. Newcomer filed for record in the recorder's office of Cook county an affidavit stating that he had purchased from Frances E. Peiffer on September 28, 1925, a certain forty-acre tract of land in Cook county for the sum of $45,000 on terms which were stated, but that after entering into the contract she received an offer of a larger price for the property and refused to comply with her contract; that affiant claimed to be the equitable owner of the contract and was ready, willing and able to carry out its conditions and insisted on the carrying out of the contract as it was made. On November 23 Frances E. Peiffer filed a bill of complaint in the superior court of Cook county showing that she was the owner of the property in question and that on October 30, 1925, Newcomer and John A. Carroll caused to be filed in the office of the recorder of deeds of Cook county the affidavit which has been mentioned; that Newcomer was acting on behalf of Carroll, and that the complainant did not sell to Newcomer the premises in question and did not enter into any contract for the conveyance of them; that the recorded affidavit is a cloud on her title, and she therefore prays that Newcomer and Carroll be required to answer the bill, but

not under oath, and that the cloud upon her title be re-
moved. Newcomer filed an answer to the bill, alleging that
the contract of sale was entered into between the com-
plainant and Newcomer; that the latter holds the equitable
title and is entitled to the legal title to the premises, and
that the affidavit is not false but is true in every particular.
Newcomer also filed a cross-bill asking for the specific per-
formance of the contract. Afterward by leave of the court
the cross-bill was amended so as to make Carroll and Ed-
ward J. McMullen parties complainant, and McMullen was
also made a defendant to the original bill and permitted to
join in the answer of the other defendants. Mrs. Peiffer's
answer to the cross-bill denied that she agreed to sell the
land to the cross-complainants for any price or upon any
terms or authorized any other person to enter into any such
agreement on her behalf or that any such contract or agree-
ment was ever entered into; that the contract alleged was
not in writing, nor was there a sufficient memorandum or
note thereof signed by her or some other person thereunto
by her lawfully authorized in writing, and she claimed the
benefit of the Statute of Frauds. The cause was referred
to a master, who reported the evidence together with his
finding of fact that there was no contract in writing exe-
cuted by Mrs. Peiffer or anyone as her agent authorized
in writing to bind her, and his conclusion that the cross-
complainants had no interest in the real estate and were not
entitled to the relief prayed for in the cross-bill but that
the affidavit was a cloud upon the title of the complainant,
which should be removed. Objections by the cross-com-
plainants to this report were overruled by the master and
their exceptions were also overruled by the court, and a
decree was entered dismissing the cross-bill for want of
equity and removing the cloud caused by the affidavit upon
the complainant's title.

There is no serious conflict as to any question of fact.
Mrs. Peiffer, a resident of Denver, Colorado, had corre-

sponded with a firm of real estate brokers in Chicago with reference to the sale of the land and had written a letter to them saying that she would consider an offer of $1000 an acre. On August 17, 1925, they wrote her that they had received an offer of $35,000 for the land upon terms which they stated. On August 26 she telegraphed to P. E. Leonard, a member of the firm, that her son would leave for Chicago shortly and would see him with reference to the property. Her son, John Peiffer, left Denver on September 2. He had no authority to sell the land and so informed all with whom he dealt in Chicago with reference to it. He spent several days investigating the value of the property, visited brokers and called upon John D. Wild, who was a member of the bar but had not been in general practice for several years, who was secretary and treasurer of the First Realty Company. Peiffer wanted him to take care of any legal work he might want done, to draw up and pass upon the contracts if any offers for the property were received, so that Peiffer would know they were all right before he sent them to his mother. He visited several brokers but put no price on the land and informed them that any price which had been made was withdrawn. On September 28 Peiffer went to Wild's office to meet Leonard and was introduced to Newcomer, who made an offer for the property of $45,000,—one-third cash and the remainder on or before five years after date,—which Peiffer was willing to send to his mother for her consideration. Peiffer agreed to recommend it to his mother, and Wild drew the contract and sent it to her, inclosing a letter from Peiffer recommending its acceptance and a letter written by Wild explaining its terms, in which he stated that Newcomer was the personal agent of John A. Carroll, president of the Hyde Park Trust and Savings Bank, and that Wild considered that he was thoroughly responsible and able to carry the contract out promptly. When Mrs. Peiffer received the contract she submitted it to D. W. Strickland, her attorney, for his ad-

vice and for such action as he saw fit to take, who there-
upon wrote to Wild on October 5 that he had been worry-
ing over the possible income tax of Mrs. Peiffer in connec-
tion with the sale, as well as about the sale itself, but was
in hopes that it could be concluded, and wanted to submit
for Wild's consideration a change in the contract by divid-
ing the cash payment into two or three payments, so that
the first would be smaller than one-fifth of the purchase
price, so as to make the contract come within "deferred
payment sales," as defined in certain articles of the income
tax regulations. The letter stated: "Such contract, in
fact, could be prepared, and when the second payment after
the down payment is due it could be submitted to the pur-
chaser and he could see that the contract in no way changed
his obligations, and he could probably agree to use the new
form instead of the old one. Such a contract, you can see,
will lessen the taxes very materially, and it practically all
depends on making the first payment less than one-fourth
of the purchase price." Wild answered this letter on Octo-
ber 8, saying in regard to the income tax: "I have ex-
amined the regulations and Corporation Trust Company
reference you gave and also the books of the Commerce
Clearing Service. One of the decisions describes a sale with
a twenty per cent cash payment and the balance secured by
purchase money mortgage, payable on or before five years,
in annual installments of six and two-thirds per cent of
the price, or more. This was held to be a sale on the in-
stallment plan. I have learned of one or two recent sales
in acre property involving rapid increase in value similar
to this, in which the details were worked out with a cash
payment of twenty per cent and the balance in quarterly
installments spread over a five-year period. It seems clear
that this method will bring Mrs. Peiffer within the regula-
tions and I have no doubt that I can arrange with the pur-
chasers to consent to such a change. The one difficulty
with this arrangement which bothers me is the probability

326—13

of the purchasers exercising the on-or-before privilege of payment. If within a year or two this should be done, of course Mrs. Peiffer would have to account for all cash received in any one year. Are you willing to take your chance on this possibility?" Strickland wrote to Wild on October 12 that Mrs. Peiffer was living out of town and could not be reached by telephone and he was sending Wild's letter out to her. The letter concluded: "I am glad you are sure that purchasers will consent to making a change in the form of contract. I will write you again as soon as I have more and definite information." After receiving Strickland's letter of October 5 Wild telephoned Edwin J. Nelson, who represented Newcomer, and told him that he had received a letter from an attorney in Denver who apparently represented Mrs. Peiffer, who had raised the question in regard to the income tax and the possibility of working out a contract which would bring the sale within the deferred payment regulations of the Income Tax law and might involve more changes and would mean a reduction of the cash paid on the contract. He told Nelson that he inferred from the letter that if these changes could be worked out probably the contract would be accepted and signed by Mrs. Peiffer, and that he had answered the letter saying that he had no doubt the purchaser would consent to the change. Nelson answered that Newcomer and McMullen were in his office at the time and he would give them the message. He thought the changes would be accepted. Nothing more was done with reference to the contract. Mrs. Peiffer did not sign it and did not authorize anyone to sign it for her and had no further communication, directly or indirectly, with Newcomer.

A written contract is one which is all in writing, so that all its terms and provisions can be ascertained from the instrument itself. (*Gronowski* v. *Jozefowicz,* 291 Ill. 266.) To entitle a party to the specific performance of a contract the terms must be clear, definite and certain. It is not

enough to show that some kind of contract exists between the parties, but it must be so definite and certain in all its terms that the court can require the specific thing contracted for to be done. (*Westphal* v. *Buenger,* 324 Ill. 77; *Carson* v. *Davis,* 171 id. 497; *Koch* v. *National Union Building Ass'n,* 137 id. 497.) An agreement in writing which does not purport to give an absolute right without further negotiations thereon cannot be specifically enforced. The contract which Newcomer signed and Wild mailed to Mrs. Peiffer was a proposal for the purchase of the land which Mrs. Peiffer did not accept, but her attorney to whom she referred the matter raised an objection to the contract because of the possibility of the income tax liability of Mrs. Peiffer on account of the sale. He suggested this objection to Wild, who was not authorized by either party to make or accept any terms but who had acted for John Peiffer in the negotiations which resulted in the proposal, and submitted for his consideration the change dividing the cash payment into two or three payments, so that the first one should be smaller than one-fifth of the total purchase price. This change, he thought, would bring the sale within "deferred payment sales," as defined in the income tax regulations, and would lessen the taxes very materially. This suggestion was not made to Newcomer, the purchaser, and Wild was not asked to make the suggestion to him. It was submitted to Wild for his consideration and not as a proposal to the other parties to the contract. Wild and Strickland had been friends. Wild had formerly been Mrs. Peiffer's attorney. In these negotiations he had been employed by her son. He did not represent Newcomer and he had no authority from Mrs. Peiffer and assumed none. The letters of Strickland and Wild were communications between Mrs. Peiffer's attorney and the attorney who had acted as her son's adviser in the negotiation leading up to Newcomer's proposal and its submission to Mrs. Peiffer. Wild was under no obligation to Newcomer to submit the contents of

the letter to him, but he was interested to the extent of one-third of the broker's commission which Newcomer's proposal provided that Mrs. Peiffer should pay in the event of the consummation of the sale, and informed Nelson he had received a letter from Mrs. Peiffer's attorney, who had raised a question in regard to the income tax and suggesting changes in the contract, and saying that if these changes could be worked out he inferred that the contract would probably be accepted and signed by Mrs. Peiffer. What the changes were was not mentioned, though the character of them was.

It is manifest from reading Strickland's letter of October 5 that the changes were not definitely stated but would have to be agreed on. The appellants contend that the letter was a conditional acceptance of Newcomer's proposal, subject only to the change of the cash payment from $15,000 to $9000, which might be accepted verbally by the appellants without any writing and was so accepted. The letter was not capable of this construction. The cash payment in the contract was $15,000. The letter did not propose to make the cash payment less than $15,000 but proposed to divide it into two or three payments, so that the first one should be "smaller than, say, one-fifth of the total purchase price, so as to bring it within the terms of the articles mentioned." Whether it should be divided into two or three payments and what should be the amount or the time of the second or third payment is not suggested; and again, it is said that such a contract would "lessen the taxes very materially, and it practically all depends on making the first payment less than one-fourth of the purchase price," which would be $11,250. The letter was not intended to be and was not submitted to Newcomer for his acceptance or rejection, and if it had been so submitted with Mrs. Peiffer's authority and had been accepted, the time and the amount of the second or third payment would still have been the subject of negotiation. This correspond-

ence was all carried on between her attorney and Wild, who was, at most, a broker with no authority to make or modify a contract, with reference to the best course to be taken by Mrs. Peiffer to reduce her liability for income tax arising out of the sale, and cannot be made the basis for Newcomer's accepting a possible modification of the contract which was under consideration between her attorney and the broker but was never decided on by them or proposed to Newcomer. The minds of the parties never met upon the terms of the contract for the sale of the land and there was no basis for a decree of specific performance.

The decree of the superior court is affirmed.

*Decree affirmed.*