(No. 19130.—

FRANK H. SHAVER *et al.* Appellees, *vs.* HERBERT WICK-
WIRE, Appellant.

*Opinion filed April 20, 1929—Rehearing denied June 6, 1929.*

DUNCAN & O'CONOR, for appellant.

WILLIAM ZWANZIG, and BUTTERS & BUTTERS, for
appellees.

Mr. Chief Justice DeYoung delivered the opinion of court:

Frank H. Shaver and Fannie N. Shaver, his wife, filed a bill for specific performance against Herbert Wickwire in the circuit court of LaSalle county. A decree in conformity with the prayer of the bill was rendered and the defendant prosecutes this appeal.

In the year 1926 appellee Frank H. Shaver owned a farm of ninety acres situated about five miles northeast of the city of Ottawa, in LaSalle county. The farm was improved by a dwelling house and other improvements and was occupied by a tenant. There were two incumbrances on the farm, one for $4500 and the other for $4906, both bearing interest at six per cent per annum. Herbert Wickwire, the appellant, resided a short distance west of Shaver's farm and owned about four hundred acres of land in the vicinity.

The evidence on behalf of appellees tended to show the following facts: Shaver desired to sell his farm and had listed it for sale with several agents. Early in July, 1926, when the interest on one of the mortgages was overdue and the bank which held the mortgage was demanding payment, Shaver called on Wickwire and asked him to purchase the farm. Wickwire first answered that he did not need more land, but before Shaver left told him he, Wickwire, might call at the bank and tell its officers he thought he would take the farm. Shaver saw Wickwire about a week later but found that the latter had not gone to the bank. During this conversation Wickwire promised to do so, and added that he might take the farm at $125 per acre, assume the mortgages and pay Shaver the difference between the purchase price and the sum of the mortgage indebtednesses. He objected, however, to paying interest on the mortgages at six per cent, the stipulated rate, and asserted

that he would not enter into any agreement for the purchase of the farm without first interviewing the officers of the bank. Nothing was said about the payment of taxes or the delivery of an abstract of title. Shaver and his wife met Wickwire about the first of August at the latter's farm. Wickwire told them that if the abstract showed a good title he would take the farm, with the grain upon it, and pay the taxes for the current year, and he requested Shaver to ascertain whether the tenant would surrender his lease. The abstract of title, Shaver informed Wickwire, was in the possession of the First National Bank of Ottawa. Afterwards Shaver learned that Wickwire had borrowed the abstract and that it had been extended to date and examined. About August 20, 1926, Wickwire told Shaver that the title to the land was merchantable. At that time the growing crops consisted of about thirty acres of corn and twenty-seven acres of oats. Shaver reported to Wickwire that the tenant was willing to surrender his lease in the autumn of that year. Shortly thereafter, in two or three successive conversations with Shaver or his wife, Wickwire stated that he would cause the papers for the purchase of the farm to be drawn. Prior to the time of threshing, the tenant, pursuant to Shaver's request, inquired where he should deliver Wickwire's share of the oats, and Wickwire directed him to put them in a bin not on Shaver's but on Wickwire's land. About the 12th of September Wickwire informed Shaver that he would not take his farm. Shaver had already withdrawn the sale of the farm from the several agents with whom he had listed it, and the taxes on the farm and the interest on the mortgages remained unpaid. In October Shaver tendered Wickwire a warranty deed to the farm, which the latter refused to accept. The deed was in the statutory form and purported to convey the land subject only to the taxes for the year 1926. The incumbrances on the land were not mentioned in the deed. A receiver was appointed, who took charge of the rest of the crop,

and a new tenant occupied the farm in 1927. No contract in writing for the sale of the land was entered into by the parties and no payment on account of the purchase was ever made by the appellant.

The evidence on behalf of the appellant tended to show the following: When Shaver called to see Wickwire the first time he stated that if he did not pay the interest on one of the mortgages it would be foreclosed, and since he had been acquainted with Wickwire's parents he desired Wickwire to have the farm. Shaver's price was $125 per acre. Wickwire wished to see the holders of the mortgages before deciding to purchase the farm. The second conversation between Shaver and Wickwire was similar to the first. Afterwards Wickwire went to the First National Bank of Ottawa, obtained the abstract and had it examined. The attorney who made the examination reported orally that the title was satisfactory. About August 20, 1926, Shaver told Wickwire that he was going to thresh and wanted the latter to take the oats. Wickwire answered that the oats belonged to Shaver. The oats, Shaver replied, were of little value and Wickwire might as well take them. Shortly thereafter Wickwire told the tenant that he was considering the purchase of Shaver's land, and that, after threshing, the tenant might put the oats in a bin on Wickwire's farm. Later Wickwire found that oats, exceeding one hundred bushels in quantity, had been put in the bin in his absence. About the first of September Wickwire told Shaver that he would not take the farm. Shaver then asked him to buy the oats, but Wickwire declined to do so because they were musty and dirty. Failing to sell his oats, Shaver endeavored to borrow money from Wickwire for the purpose of paying the interest on his mortgages. Wickwire did not make the requested loan. Shaver called again and offered Wickwire an envelope which contained certain papers, but he refused to read or to accept them. The oats were finally scattered over Wickwire's land.

The tenant's lease was never assigned or surrendered to Wickwire nor did the latter ever pay any money in or toward the purchase of Shaver's land. On rebuttal Shaver denied that he attempted to sell the oats to Wickwire or that he sought to borrow money from him to pay interest on the mortgages.

It appears from appellees' evidence that Shaver's farm was incumbered by two mortgages which approximated its value. To be relieved of the financial burden he was anxious to sell the farm, and he sought to persuade his neighbor, the appellant, to purchase it. They met and discussed the matter on several occasions, and appellant expressed his inclination to tell the officers of the bank which held one of the mortgages that he would take the farm at $125 per acre, assume the payment of the mortgages and pay Shaver the difference between the purchase price and the sum of the two incumbrances. No written contract of sale was ever entered into and no portion of the purchase price was ever paid. After appellant refused to take the farm appellees tendered him a deed, but it made no reference to either incumbrance, and its acceptance necessarily would have involved the satisfaction of the mortgages and their discharge of record. Apparently there was no agreement upon the question whether the mortgages should be paid out of the purchase price or be assumed by the purchaser. In case of the latter alternative, appellant, according to appellees' evidence, refused to pay interest at the rate stipulated in the mortgages. No time was fixed for surrendering possession of the farm. To entitle a party to specific performance the provisions of the contract sought to be enforced must be clear and certain and make the precise acts which are to be performed clearly ascertainable. The contract, if it is to be enforced, must be enforced according to its terms. A court has no authority to compel a party to do something different from that which by his contract he has agreed to do. In specific performance it is the province

of the court to enforce the contract which the parties have made and not to make a contract for them and then enforce it. (*Olson* v. *Forsberg,* 332 Ill. 266; *Westphal* v. *Buenger,* 324 id. 77; *Gronowski* v. *Jozefowicz,* 291 id. 266; *Rampke* v. *Beuhler,* 203 id. 384.) The contract upon which appellees rely was uncertain and indefinite in important respects and for that reason is not specifically enforcible.

Appellees, however, invoke the interposition of a court of equity, assigning as grounds therefor the delivery of a quantity of oats to appellant by appellees' tenant, the withdrawal of the land from sale by agents, and appellees' omission to pay interest on the mortgages and taxes on the assumption that the farm had been sold to appellant. The oats were not delivered by appellant's request. Pointing out a place upon his farm for their storage did not amount to a representation that compliance with his direction would give rise to or complete a contract for the sale of the farm. The value of the oats, deemed inconsiderable both by Shaver and appellant, was readily ascertainable and could be recovered in an action at law. The termination by appellees of the authority of the several agents to sell the farm and appellees' failure to pay the interest on the mortgages and the taxes on the land, likewise could not confer the right to specific performance of a contract otherwise not so enforcible. Appellant had neither taken possession of the farm nor exercised control or dominion over any part of it. Part performance sufficient to require specific performance assumes such a change in the relation of the parties that a restoration to their previous condition is impracticable, and a refusal to go on and complete the engagement would be a virtual fraud upon one of the parties. (Pomeroy on Specific Performance of Contracts,—3d ed.—secs. 101, 104, 106; *Wisherd* v. *Bollinger,* 293 Ill. 357; *Thackaberry* v. *Kibbe,* 284 id. 199.) Appellees have not been induced by any act of appellant to perform the alleged oral

agreement to such an extent that justice can only be administered by decreeing its specific performance.

The decree of the circuit court of LaSalle county is reversed and the cause is remanded to that court, with directions to dismiss the bill for want of equity.

*Reversed and remanded, with directions.*