234

Borg-Warner Corporation, Appellant, *vs.* Anchor Coupling Co., Inc., *et al.* Appellees.

*Opinion filed Nov. 26, 1958—Rehearing denied March 18, 1959.*

ROBERT W. MURPHY, CHARLES W. HOUCHINS, and DEAN M. HENNESSY, all of Chicago, for appellant.

WILLIAM C. WINES, ROBERT J. BURDETT, and BISHOP, BURDETT, FALASZ AND DOHERTY, all of Chicago, for appellees.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

This action was brought by Borg-Warner Corporation for specific performance or, in the alternative, money damages, on an alleged contract between plaintiff and Anchor Coupling Co. and its chief officers, Charles L. Conroy and Walter Fritsch. The amended complaint was dismissed on the ground that plaintiff had failed to allege a completed contract capable of specific performance or a cause of action for damages.

This appeal was transferred to this court from the Appellate Court, Second District, for the reason that a freehold is involved, certain real property being among the assets of defendant which were the subject of the alleged contract.

Since the propriety of the lower court's dismissal of the case depends solely on the sufficiency of plaintiff's amended complaint, it is necessary to set forth the facts as alleged in said complaint in some detail.

Plaintiff and defendant, Anchor Coupling Co., hereinafter called Anchor, are corporations organized under the laws of Illinois and engaged in the business of manufacturing. Anchor has issued and outstanding 4,400 shares of stock, owned as follows: Walter Fritsch 1,649 shares, John

Fritsch (son of Walter Fritsch) 396 shares, Charles L. Conroy 2,045 shares, Wier (uncle of Charles L. Conroy) 145 shares, and Leubkeman 165 shares. Defendant Fritsch dealt with and represented the stock owned by his son, John Fritsch, as though it were his own, and defendant Fritsch, John Fritsch and defendant Conroy owned at all relevant times 92.96 per cent of Anchor's stock. For ten years defendants Conroy and Fritsch have constituted two of the three directors of Anchor and have dominated and exercised complete control over all the affairs and acts of Anchor with the acquiescence and consent of the other shareholders and the board. The third director, Albrecht, an employee of Anchor, has never owned any shares in the company.

Prior to February 20, 1956, plaintiff engaged in conferences and negotiations with defendants Conroy and Fritsch, as controlling shareholders of Anchor and its chief executive officers and directors, respecting the purchase by plaintiff of all of the property and assets of Anchor. As a result of these negotiations an oral agreement was reached that defendants would sell to plaintiff all of said property and assets for the sum of $4,023,500, if the results of a survey and investigation of Anchor's assets were satisfactory to plaintiff.

On February 20, 1956, plaintiff wrote a letter to Anchor setting forth a detailed agreement giving plaintiff a 60-day option to purchase all of Anchor's business and assets. This was not signed by Anchor, but instead, on February 29, 1956, a letter was sent to plaintiff on Anchor's letterhead and signed by defendants Conroy and Fritsch. Since the decision in this case turns chiefly upon the interpretation to be placed on this letter, we quote its significant parts in full:

"Gentlemen:

This letter will outline and confirm our conversation at luncheon today with your Messrs. Porter, Murphy, Steg and Peifer.

We are unwilling to enter into a formal option with your company as proposed in your letter of February 20, 1956. This is not for the purpose of horse-trading, but rather to avoid the damage which a turn-down by you would cause both internally and in our market.

We would be willing to sell the assets of our company to you for $4,025,000 in accordance with the terms of paragraphs 3, 5, 6, 7, 8, 9, 11, 13, 14 and 17 of your letter of February 20, 1956, if such an offer were made today without the reservations elsewhere contained in that letter, and subject to the exceptions noted below.

You may consider this as a letter of intent authorizing you to make the survey you deem necessary to make your offer a firm and binding one; and we assure you of our full cooperation in making it. We suggest that it be completed as quickly as possible.

\* \* \*

You are assured that should you make a firm offer within fifty days from this date, we are willing to enter into a contract with you on the basis of the terms of the above numbered paragraphs of your letter of February 20, 1956, with the following exceptions:

(a) That suitable assurances are given for the retention of the lower level executive personnel;

(b) That mutually satisfactory arrangements are made for the continued employment of Charles L. Conroy;

(c) That J. D. Leubkeman shall not be a party to any restrictive covenant as outlined in paragraph 8 of your letter of February 20, 1956; and

(d) That any purchase price adjustment mentioned in paragraph (7) of your letter of February 20, 1956, shall be made only by mutual agreement between us."

Plaintiff thereafter inquired of defendants whether their letter of February 29 was correctly understood by plaintiff as a firm offer which would not be revoked during the period stated in said letter (which period was later extended to April 26, 1956) and which plaintiff could accept within said period so as to create a binding contract of sale, and whether plaintiff could make its survey of Anchor's business operations in reliance thereon. In response thereto, defendants Conroy and Fritsch, by their agent, assured plaintiff that plaintiff had "in effect an option"; that said letter was "in legal effect \* \* \* an offer by us [defendants] to enter

into a contract with those four very minor things [referring to paragraphs (a) through (d) of defendants' letter of February 29] still to be agreed on'; that the further agreements referred to were not intended to prevent said offer from being a complete offer capable of acceptance but were minor details which, upon the acceptance of said offer, the parties would be obligated to work out in good faith in a reasonable manner, and that if plaintiff within fifty days made an offer in conformity with said letter, defendants would be obligated, subject only to the conditions that the acceptance be delivered within the time limited and that the investigation be conducted in secrecy, to accept such offer.

On March 14, 1956, plaintiff wrote a letter to Conroy, Fritsch and Anchor saying, "You indicate that our offer on the basis outlined will be accepted if made within fifty days from this date" and asking that the fifty days time be extended to April 26 and that the purchase price be adjusted to $4,024,000. This letter was initialed by Conroy and Fritsch and returned to plaintiff.

Finally, on April 26, 1956, plaintiff wrote to defendants saying that plaintiff had decided to proceed in the acquisition of Anchor's assets. This letter read in part: "Please consider this our formal offer, therefore, to enter into an agreement in accordance with our letters to you of March 14th, and February 20th and your letter to us of February 29th. Our letter to you of March 14th, the terms of which were accepted by you indicates that this offer will be accepted by you if mailed on April 26th."

Plaintiff alleges that at this point a completed contract came into existence. Plaintiff also alleges that in various subsequent conversations defendants represented and agreed that there was a complete contract between plaintiff and defendants until on August 1, 1956, defendant Conroy raised objections to the performance of said contract, and on September 27, 1956, refused to perform said contract.

Defendant Fritsch filed an answer admitting the allegations of plaintiff's complaint and stating that "he did believe that he did enter into a contract and agreement, that the same was fair, open and truly performed on its part by the plaintiff, and this defendant does again reiterate his willingness to perform the same for and on behalf of the shares of stock owned by him and by his son, John Fritsch." Defendants Conroy and Anchor filed motions to dismiss plaintiff's amended complaint.

On these facts, the trial court dismissed the amended complaint on the ground that it appeared on the face of the pleadings that the parties had failed to agree on material terms of the proposed contract, *viz.:* (a) The failure to agree on the retention of lower level executive personnel, and (b) failure to make mutually satisfactory arrangements for the continued employment of Conroy. Further, the court held that there was no ambiguity in the written correspondence between the parties and therefore the Statute of Frauds and the parol evidence rule barred consideration of any parol evidence pleaded by plaintiff.

First, let us analyze the correspondence between the parties in terms of the contract rules of offer and acceptance. Plaintiff's letter of February 20, setting forth the detailed option agreement, was an offer by plaintiff. This offer was not accepted by defendants, but instead, defendants Conroy and Fritsch wrote a letter to plaintiff stating that they would be willing to sell the assets of Anchor in accordance with certain paragraphs of plaintiff's February 20th letter, that plaintiff could consider this a "letter of intent," and that if plaintiff should make a firm offer within fifty days, defendants would enter into a contract with them on the basis of the enumerated paragraphs of the February 20 letter, with the exceptions: (a), (b), (c) and (d). This letter varied the terms of plaintiff's offer and thus constituted a counteroffer. (*Snow* v. *Schulman,* 352 Ill. 63, 71.) Although it spoke in terms of plaintiff

making an offer, it must be viewed as an offer itself, asking that plaintiff's acceptance be worded as an offer. This is clear from the fact that defendants referred to plaintiff's offer as a "firm and binding" one. The only way it could be firm and binding would be that it legally constituted an acceptance. As requested, plaintiff accepted by submitting a "formal offer" on April 26.

Was this acceptance sufficient to create a contract at this point or, as defendants contend, did exceptions (a) and (b) prevent the formation of a contract? The answer depends on what the parties intended. (1 Corbin on Contracts, 1st ed. 1950, p. 69.) Were defendants asking that contracts of employment between plaintiff and the lower level executive personnel and between plaintiff and Conroy actually had to be agreed to as conditions precedent to the existence of the contract? Or, were defendants merely asking that plaintiff, by a general acceptance, give assurance as to the retention of lower executive personnel and agree that mutually satisfactory arrangements would be made for the employment of Conroy?

In this regard, we find the offer in the February 29 letter to be ambiguous. Thus this case falls within the well-recognized exception to the parol evidence rule that if the terms and provisions of a contract are ambiguous, or if the writings are capable of more than one construction, parol evidence is admissible to explain and ascertain what the parties intended. (*Street* v. *Chicago Wharfing and Storage Co.* 157 Ill. 605; 32 C.J.S., Evidence, sec. 959.) This applies to contracts within the Statute of Frauds as well as to any other contract. Plaintiff is not seeking to add terms to the writings by parol, but is merely trying to explain what the parties intended by the written words. The trial court was in error in holding that the parol evidence pleaded by plaintiff could not be considered.

The question then is whether the written correspondence, together with the facts pleaded explaining the terms

of the written communications, taken in its most favorable aspect, disclose a contract. We believe the following factors, if proved, are sufficient to support a finding that a completed contract came into existence at the time plaintiff submitted its formal offer on April 26. In so holding, it is impossible to place great reliance on other cases except insofar as they state general principles of law. Contract cases, particularly, must each turn on their own particular facts. As said by Professor Corbin, "A transaction is complete when the parties mean it to be complete. It is a mere matter of interpretation of their expressions to each other, a question of fact." 1 Corbin on Contracts, 1st ed. 1950, p. 69.

Both plaintiff and defendant Fritsch intended that a general acceptance by plaintiff was all that was necessary for a contract to come into existence. Fritsch has so admitted by his answer stating that he believes there was a binding contract. Although we do not believe this admission is determinative of the case, it is extremely significant as tending to show that the parties so intended.

The fact that plaintiff spent large sums of money in conducting a survey of Anchor's business certainly tends to indicate that it believed a mere acceptance of defendants' offer would be sufficient to form a contract. If plaintiff had believed that employment contracts had first to be agreed upon, one would seriously question whether it would expend such large sums without attempting to negotiate such contracts. Furthermore, plaintiff was not unreasonable in its belief . Defendants' letter of February 29 was sprinkled with "assurances" to induce plaintiff to expend substantial money in making a survey. It referred to plaintiff's right to make a "firm and binding" offer and defendants' offer to "enter into a contract with you." Such language warranted a reasonable belief on the part of plaintiff that a contract would be completed by its acceptance of the offer.

Defendants themselves quote Professor Corbin as saying: "Even though one of the parties may believe that the negotiations have been concluded, all items agreed upon, and the contract closed, there is still no contract *unless he is reasonable in his belief and the other party ought to have known that he would so believe.*" (1 Corbin on Contracts, sec, 29, 1st ed. 1950, p. 66.) (Emphasis supplied.) We are of the opinion that plaintiff was reasonable in its belief and that defendants, knowing of plaintiff's large expenditures, "ought to have known that (plaintiff) would so believe" that its acceptance of defendants' terms would create a contract.

Another important factor is the allegation that plaintiff specifically inquired whether defendants' February 29 letter was intended as a firm offer which plaintiff could accept within fifty days so as to create a binding contract. In response, defendants, by their agent, assured plaintiff that it had "in effect an option" and that exceptions (a) through (d) were not intended to prevent said offer from being a complete offer capable of acceptance but were minor details which, upon the acceptance of said offer, the parties would be obligated to work out in good faith in a reasonable manner. Such facts clearly support plaintiff's contention that the parties intended that all that was necessary to complete the contract was plaintiff's general acceptance of defendants' terms.

Plaintiff further alleges that subsequent to its acceptance of April 26, defendants, by their actions and conversations, represented that there was a completed contract between the parties.

If, as the above evidence indicates, the parties intended that a general acceptance by plaintiff would complete the contract, the fact that the employment contracts of Conroy and other executive personnel were left for future agreement does not preclude the existence of an enforcable contract. See *Welsh v. Jakstas,* 401 Ill. 288, 297, where this

court said: "The option, when accepted, resulted in a present contract for the sale of real estate. The provisions of the option agreement then constituted the contract of sale and stated in clear and unambiguous language, the price, terms and conditions of the sale. *A contract is not rendered void because the parties thereto contract or agree to contract concerning additional matters.*" (Emphasis supplied.)

We are of the opinion that on the allegations of the complaint, the trier of fact could find that there was a binding contract of sale in the instant case. Plaintiff therefore was entitled to a trial on the question of the existence of the contract. Where it is necessary to have recourse to parol evidence to determine the meaning of language used in letters or telegrams which are relied upon as evidencing a contract, the question as to the factual meaning of such language is for the jury if opposite conclusions may be drawn. *Brown* v. *M'Gran,* 14 Pet. (U.S.) 479, 493.

If, upon a trial, it is found that there was a binding contract, we see nothing to prevent the specific performance of that contract. Defendants' argument that the contract is not specifically enforceable because it did not purport to bind defendant corporation is without merit. Whether Anchor was bound or not is not controlling since plaintiff is seeking a decree requiring Conroy and Fritsch (who own 93 per cent of the stock) personally to carry out the steps necessary to cause Anchor to transfer its assets. In *Schmidt* v. *Schmidt Bros. Co.* 272 Ill. 340, where a similar argument was made, this court said: "While the agreement of the parties to sell the property of the corporation was not sufficient to transfer the legal title to such property, their contract, upon sufficient consideration, to do any lawful act was binding. While the sale of the tools for $1,000 did not transfer the title to them, this fact does not relieve John F. Schmidt from the obligation of his contract. He agreed to wind up the corporation in a lawful manner within three months, to pay all accounts

and bills of the corporation and not to use its name for any new work. It was within his power to do or not to do these things. There was nothing unlawful in his agreement and the contract is one which a court of equity will enforce."

Neither do we think the contract was too indefinite to be capable of specific enforcement. The only thing left for future agreement was the employment contract of Conroy. Under the terms of the offer and acceptance, the parties have agreed that Conroy is to be employed under "mutually satisfactory arrangements." A mutually satisfactory arrangement is a reasonable arrangement. "The phrase 'mutual satisfaction' means reasonable satisfaction. * * * Assuming that mutual satisfaction is equivalent to satisfaction to each party independently, that mutual satisfaction necessarily would have to be reasonable satisfaction * * *. The burden we have here is to find out whether the parties have reserved the right to be arbitrary or whether they have such right for a reasonable satisfaction controlling upon both contracting parties. We think that we should construe 'mutual satisfaction' as reasonable satisfaction and thus uphold the contract." (*Bondy* v. *Harvey*, (2d Cir. 1933) 62 F.2d 521, 524, *cert. den.* 289 U.S. 740.) A promise to render performance satisfactory to a reasonable man is not too indefinite. (3 Williston, Contracts, section 675A.) Cases relied on by defendants in which promises were held too indefinite for enforcement because the contract reserved a unilateral right to satisfaction by one party are not in point here where the contract provides that the arrangement will be mutually satisfactory. If the parties cannot agree, proof of Conroy's present terms of employment, of the prevailing rates of compensation and other terms of employment of persons in a similar standing in similar businessses, and of established prior practices at Anchor, would enable a court or jury to fix reasonable terms of employment. Thus the contract, if established, is capable of specific performance.

For the aforesaid reasons, the decree is reversed and the cause is remanded to the trial court with directions to overrule defendants' motions to dismiss and to order defendants to answer.

*Reversed and remanded, with directions.*

Mr. JUSTICE SCHAEFER, dissenting:

It seems to me that when a large corporation is purchasing a smaller one, the fate of the employees of the selling corporation will naturally be a matter of concern to its management. It was a matter of concern here, expressed in the exception taken with respect to the "lower level executive personnel." I do not find that agreement was ever reached as to that matter. Nor was agreement ever reached as to the employment and compensation of Conroy by the purchasing corporation. For these reasons I think that no contract existed and that the judgment of the trial court should be affirmed.

Mr. JUSTICE BRISTOW, also dissenting:

I must respectfully dissent from the majority opinion in this case. I disagree with the premises set out in the opinion and the conclusions of law based thereon.

This case comes to us on the motions of the defendant corporation and of the defendant Charles L. Conroy, the president and general manager of the corporation, to dismiss plaintiff's amended complaint for specific performance, or, in the alternative, money damages against Conroy alone, on an alleged contract between the plaintiff and the defendants.

The original complaint was for specific performance only. It was predicated solely upon the five letters subsequently relied upon in the amended complaint, four of which are mentioned in the majority opinion. The plaintiff alleged that the first four letters between the parties, under date of February 20, February 29, March 14, and April 16, 1956, constituted "a contract between defendants

and plaintiff for the sale of the assets of defendant Anchor." It was to the original complaint that defendant Fritsch filed an answer, in effect joining in the complaint without costs to him. To that complaint the separate motions to dismiss by the corporation and Conroy, individually, were sustained. The trial court held that the plaintiff had failed to allege a contract capable of specific performance, and, therefore, did not decide the further question as to whether such a contract, if completed, could be enforced against the corporate defendant.

Plaintiff thereafter filed its amended complaint. It appears from the record that Fritsch filed no pleading whatsoever to this amended complaint which is before us now.

The trial court again sustained the separate motions of the corporation and the defendant Conroy to dismiss the amended complaint for specific performance, including the alternate count for money damages, on essentially the same grounds that the motions were sustained to the original complaint.

By defendants' motions to dismiss the amended complaint the following contentions, among others, are made: (1) There was no meeting of the minds between the parties to the alleged contract; (2) the Statute of Frauds and the parol evidence rule excluded the oral conversations pleaded; (3) specific performance will not lie to compel sale of the corporation's assets on the alleged contract of the two individual controlling stockholders.

It is conceded by the plaintiff, and recognized by the majority opinion, that there is no binding contract between these parties except as the same may be established by parol evidence in explanation of the correspondence.

For the purpose of this dissent, it is necessary to set out the substance of these letters from which I conclude that their literal and legal interpretation does not warrant

the conclusion that there was ever a meeting of the minds of the parties or that an agreement was ever entered into in writing by the defendants or either of them. This is clearly demonstrated by the language of these letters.

Their import and meaning may be summarized:

Plaintiff's letter of February 20, 1956, to the corporate defendant Anchor is a proposal to purchase for $100 a sixty-day option to buy all of Anchor's assets on the conditions therein set out. To this letter is added an acceptance clause: "The memorandum of agreement set forth above, granting you for 60 days an option to acquire all of our business and assets on the terms and conditions set forth, are hereby accepted and agreed to by Anchor Coupling Company, Inc., and receipt of your check for $100.00 is hereby acknowledged." This option proposal was never accepted or executed.

The letter of Conroy and Fritsch to plaintiff, under date of February 29, 1956, is explicit: "We are unwilling to enter into a formal option with your company as proposed in your letter of February 20th, 1956." This letter which was on the letterhead of the corporation, but signed by Conroy and Fritsch, individually, reads: "You may consider this as a letter of intent authorizing you to make the survey you deem necessary to make your offer a firm and binding one;" and requires the investigation to be kept secret from everyone at Anchor, and in Anchor's trade, except Conroy and Fritsch. Then it assures plaintiff that should it make a "firm offer" within 50 days from this date, Conroy and Fritsch would be willing to enter into a contract with plaintiff for $4,025,000 on certain terms and conditions taken from the earlier refused option proposal, but subject to four specific additional terms and provisions, referred to as "exceptions" which are set out in the court's opinion as exceptions (a), (b), (c), and (d).

Plaintiff's letter of March 14 to Conroy and Fritsch acknowledges receipt of their letter of February 29, assures

them that its investigation and audit would be on the required confidential basis, and then points out two "minor matters" for clarification, the first of which is so distorted in the majority opinion that it is set forth here: "1. You indicate that our offer on the basis outlined will be accepted if made 'within fifty days from this date.' The date of your letter was February 29, but as you will recall you held off mailing it to us until the following Wednesday, March 7. For this reason we were not able to start the survey as early as we otherwise might have, and while every effort will be made to complete it within even a shorter period, it seems to us that the fifty days should date from March 7 and will therefore expire April 26 * * * we will proceed on the understanding that we may mail our offer to you within the terms of your letter on April 26." The second matter on which clarification was sought was price. The letter of February 29 mentioned a flat price of $4,025,000. The letter of February 20 sought an option for $4,023,500, plus $500 each to support restrictive covenants from Conroy, Fritsch, and one Leubkeman. Leubkeman was eliminated from the restrictive covenant by exception (c), so the price suggested was $4,024,000, plus $1,000 to support the restrictive covenants of Conroy and Fritsch. Conroy and Fritsch agreed to these clarification by initialing and returning a carbon of the letter, as requested by plaintiff.

The substance of plaintiff's letter to the defendant, under date of April 26, 1956, is set out in the majority opinion, but, as I view it, the essence of this letter has been misapprehended.

Pleaded as a part of plaintiff's amended complaint is Borg-Warner's letter under date of July 12, 1956, addressed to Conroy, which letter is not alluded to in the majority opinion. Although this letter is a self-serving declaration, it is interesting to note that (1) it shows that negotiation was being carried on to reach agreement as to

exceptions (a) and (b); and (2) that *agreement on these open required terms had not yet been reached.* For example, as to exception (b), Conroy's employment, it says "if any question remains in your mind, I am sure it can be answered." As to exception (a), retention of lower level executives, it says: "although there are two or three questionable cases, you felt no unsurmountable problems remained as to the lower level executive personnel. We * * * believe we can mutually develop a fair basis for their continuing employment. * * * As to two or three salaries where you felt some further consideration should be given, I told you that we were open-minded and would be glad to go into this with you further." Most certainly this letter does not establish a completed agreement on April 26, 1956, but just the contrary.

In analyzing this correspondence, the court concludes that Conroy and Fritsch's letter of February 29 was a counteroffer, because it "varied the terms of plaintiff's offer" of February 20. This infers plaintiff's proposal to purchase an option was, in fact, an offer to purchase Anchor's assets, which it plainly was not. The proposal to purchase an option was explicitly rejected by Conroy and Fritsch.

Then the court reasons that Conroy and Fritsch's letter of February 29 is to be construed as an offer in and of itself. This reasoning is based on the use of the phrase "firm and binding" offer in the paragraph wherein the controlling stockholders authorize plaintiff to make the survey, without which plaintiff would not consider making an offer to purchase Anchor's assets. This letter, in my opinion, is not an offer nor a counteroffer but merely an invitation to plaintiff to make an offer. The paragraph wherein the phrase is used, "firm and binding" offer, is clear and explicit, and this phrase is employed merely to differentiate the offer invited from the plaintiff—one to purchase the

assets—from plaintiff's previous offer to purchase an option. Indeed, in the only paragraph of the letter of February 29 expressing contractual intent, the offer invited from plaintiff was expressed as "a firm offer,"—"you are assured that should you make a firm offer within 50 days * * * we are willing to enter into a contract with you."

I can find nothing in the letter of February 29 from Conroy and Fritsch to warrant the statement in the majority opinion that this letter is ambiguous. Most of the text of this letter is set out in the opinion. In it, Conroy and Fritsch spell out the terms on which they are willing to contract. There can be no question but that this letter is the starting point of the alleged contract, because the option proposal made by the letter of February 20 was categorically rejected, thus putting an end to it. The only purposes the letter of February 20 here serve are as a background circumstance and to supply certain terms that were from it incorporated into Conroy and Fritsch's letter of February 29.

The record here is explicit that Conroy and Fritsch would contract only if: "(a) That suitable assurances are given for the retention of the lower level executive personnel; (b) that mutually satisfactory arrangements are made for the continued employment of Charles L. Conroy." There is no ambiguity in these explicit requirements. It is patent on this record that the parties have never agreed on these two conditions. The only "ambiguity" or uncertainty that can arise is in the determination of these requirements in the absence of mutual agreement by the parties themselves.

The majority opinion lifts a quote from plaintiff's letter of March 14, "You indicate that our offer on the basis outlined will be accepted if made 'within 50 days from this date.'" The most that can be said about this letter is that it asks for an extension of time to April 26 and that

the purchase price be adjusted to $4,024,000, which clarifications were accepted by Conroy and Fritsch when they initialed this letter as requested.

The letters of February 20, February 29, March 14, and April 26 are made a part of paragraph 5 of plaintiff's amended complaint by reference. This paragraph contains the further allegations that Conroy and Fritsch, in response to an inquiry, assured plaintiff, by their agent, that the plaintiff had "in effect an option;" and that with the letter of April 26 "thereby a completed contract came into being." The majority opinion intimates that these allegations, if proved, "are sufficient to support a finding that a completed contract came into existence at the time plaintiff submitted its formal offer on April 26."

The court considers plaintiff's letter of April 26 to be an "acceptance." If it be construed as an "acceptance" or as a "formal offer" in either case plaintiff is bound by its terms. The letter says "Please consider this our formal offer, therefore, to enter into an agreement in accordance with our lettrs to you of March 14th, and February 20th, and your letter to us of February 29th."

This, then, is plaintiff's formal offer and it explicitly says it is made in accordance with the three earlier letters,— not in reliance upon any oral utterances pleaded. This "formal offer" of plaintiff is explicit that plaintiff will "enter into an agreement in accordance with our letters to you of March 14th, and February 20th, and your letter of February 29th," and not upon any oral utterances by the defendants or their agent.

Indubitably the law is: "All conversations and parol agreements between the parties prior to the written agreement are so merged therein that they cannot be given in evidence for the purpose of changing the contract or showing an intention or understanding different from that expressed in the written agreement. (3 Jones' Com. on Evidence, sec. 434.)" (*Armstrong Paint and Varnish Works* v.

*Continental Can Co.* 301 Ill. 102, 106.) "This is hornbook principle and requires no citation of authority, though much is available." *Clubine* v. *Citro*, 238 Ill. App. 479, 481.

The majority opinion fails to apply this firmly established rule of law to the present case. Applying it, any conversations leading up to the formal offer are embodied in this writing, and oral utterances of these defendants, or their agent, prior thereto, are not competent evidence in this case.

It follows that the conversation of March 1, 1956, between plaintiff and the agent of Conroy and Fritsch is incompetent as a basis of an allegation and as testimony in this case. The two later conversations on May 8 and July 10 seek to show a meeting of the minds by parol evidence.

There is no question but that the Statute of Frauds is applicable here and that parol evidence and allegations based upon such evidence must be excluded.

This court has decided too many times for the rule to be questioned: "to enable a party to a contract for any interest in land to enforce the specific performance of it the contract must be in writing, and this means that the whole contract must be written, so that all its terms and provisions can be ascertained from the writing itself, without the necessity of a resort to extrinsic evidence." (*Daytona Gables Development Co.* v. *Glen Flora Investment Co.* 345 Ill. 371, 394; *Gronowski* v. *Jozefowicz*, 291 Ill. 266, 277; *Sallo* v. *Boas*, 327 Ill. 145, 149; *Westphal* v. *Buenger*, 324 Ill. 77, 79; *Peiffer* v. *Newcomer*, 326 Ill. 189, 194; *Kopprasch* v. *Satter*, 331 Ill. 126, 128; *Hanlon* v. *Hayes*, 404 Ill. 362, 368.) Moreover, a contract within the Statute of Frauds cannot be partly in writing and partly oral. *Whitelaw* v. *Brady*, 3 Ill.2d 583, 591; *Hanlon* v. *Hayes*, 404 Ill. 368; *Daytona Gables Development Co.* v. *Glen Flora Investment Co.* 345 Ill. 371, 394; *Kopprasch* v. *Satter*, 331 Ill. 126, 127.

Over and beyond these applications of the statute, is the

further one that in contracts for the sale of land not only must the entire contract be in writing but the agent's authority to make the contract must also be in writing. (*Kopp* v. *Reiter,* 146 Ill. 437, 444, 445; *Kozel* v. *Dearlove,* 144 Ill. 23, 25, 26; *Lipkin* v. *Koren,* 392 Ill. 400, 407; *Leach* v. *Hazel,* 398 Ill. 33, 37, 38.) Nothing is shown in the amended complaint that the agent whose conversation of March 1, 1956, is pleaded had authority in writing, either from Conroy and Fritsch, or from Anchor.

The rigidity with which we have applied the Statute of Frauds is shown in *Western Metals Co.* v. *Hartman Ingot Metal Co.* 303 Ill. 479, 484. There we held that unsigned writings cannot be connected to a signed writing, unless expressly referred to in the one so signed. We there said that if we went further "then the contract becomes partly oral and partly written, and we have then introduced all the mischiefs which the Statute of Frauds and Perjuries was intended to prevent. * * * We think the established rule a wise one and will not depart from it." Such rigidity applies with equal reason to oral extrinsic proof as to connecting writings.

In reaching their decision the majority have said "it is impossible to place great reliance on other cases except insofar as they state general principles of law." This expression can only serve to bewilder those who look to the reviewing courts to establish precedent. Unless we, ourselves, are guided by precedent how else can we arrive at our decisions? And unless we establish precedents in given factual situations, how else can the trial judge and lawyer, or the scrivener, find guidance in the accomplishment of their daily tasks?

Contrary to what the majority says, there is a mass of precedent governing the factual situation presented here, compelling the conclusion that no contract was formed. For example, omitted from the majority's quotation from Prof. Corbin (1 Corbin on Contracts, 1st ed., 1950, sec. 29,

p. 66) is this statement: "Communications that include mutual expressions of agreement may fail to consummate a contract for the reason that they are not complete, some essential terms not having been included. Frequently agreements are arrived at piecemeal, different terms and items being discussed and agreed upon separately. As long as the parties know that there is an essential term not yet agreed on, there is no contract; the preliminary agreements on specific items are mere preliminary negotiation building up the terms of the final offer that may or may not be made." And in *Whitelaw* v. *Brady*, 3 Ill.2d 583, 590, we said: "It is not unusual, however, for negotiations for a contract on any subject matter to be a series of proposals and counter-proposals each narrowing the differences between the parties on certain matters and leaving open others for future determination." A similar statement appears in *Upsal Street Realty Co.* v. *Rubin*, 326 Pa. 327, 192 Atl. 481: "It is not unusual for persons to agree to negotiate with the view of entering into contractual relations and to reach an accord *at once* as to certain major items of the proposed contract and then later find that on other details they cannot agree. In such cases no contract results."

Prof. Corbin says further (1 Corbin on Contracts, sec. 22, p. 54): "In the process of negotiation a party may use words that standing alone would normally be understood to be words of 'contract,' at the same time limiting them in such a way as to say that a subsequent expression of assent on his part is required. In such case the expression is neither an operative offer nor an operative acceptance; it is preliminary negotiation. Thus, a written proposal stating many terms may be made 'subject to agreement' on another specified matter; or it may be said: 'I reserve final determination for tomorrow.' Words such as these will in nearly all cases be held to show that an operative assent has not satisfactorily been given." (See, too, 1 Corbin on Contracts, sec. 24, p. 58.) Like expressions appear

in Williston (1 Williston on Contracts, Rev. ed., sec. 45, p. 131,) and the Restatement (Restatement of the Law. of Contracts, chap. 3, sec. 25, pp. 31, 32.) There are number- less cases involving facts similar to those involved here, holding that no contract was formed. Some of them are: *Ansorge* v. *Kane,* 244 N.Y. 395, 397-400; *St. Regis Paper Co.* v. *Hubbs & Hastings Paper Co.* 235 N.Y. 30; *P.R.T. Inv. Corp.* v. *Ranft,* 363 Mo. 522, 252 S.W.2d 315-19; *Peiffer* v. *Newcomer,* 326 Ill. 189, 195, 197; *Springer* v. *Campbell Co.* 174 Ill. App. 278, 281.

It is well established that the province of a court in a specific performance suit is to enforce a contract as made by the parties and not to make a contract for them and then to enforce the contract thus made. (*White* v. *Lang,* 401 Ill. 219; *Morris* v. *Goldthorp,* 390 Ill. 186; and *Shaver* v. *Wickwire,* 335 Ill. 46.) As a basis for specific performance there must be not only a binding contract but said contract must be complete in itself without the necessity for further negotiations or agreement. *Young* v. *Kowske,* 402 Ill. 114; *Peiffer* v. *Newcomer,* 326 Ill. 189; and *Westphal* v. *Buenger,* 324 Ill. 77.

It also seems to appear well established that a court will deny specific performance of a contract involving the fur- nishing of personal services, especially where the service requires the exercise of mechanical skill, intellectual ability or the exercise of judgment, and that a court will not, by a decree of specific performance, compel an employer to hire or an employee to work against his will. *Barker* v. *Hauberg,* 325 Ill. 538; *Clark* v. *Truitt,* 183 Ill. 239, affirm- ing *Truitt* v. *Clark,* 81 Ill. App. 652; *Wollensak* v. *Briggs,* 119 Ill. 453, affirming 20 Ill. App. 50; *Cowen* v. *McNealy,* 342 Ill. App. 179; *Ledford* v. *Chicago, Milwaukee, St. Paul and Pacific Railroad Co.* 298 Ill. App. 298.

In my opinion the principles concerning specific perform- ance of a contract involved in this case are clearly announced and properly applied in the recent decision of this court in

*Cefalu* v. *Breznik,* 15 Ill.2d 168. The court there recognized that the question of part performance of a contract or the existence of a valid contract was not the question to be resolved in a specific perfomance case, but that the sole question was whether or not the agreement alleged was sufficiently definite and certain in its terms to be specifically enforceable.

The admitted facts in the present case establish that there was the necessity for further negotiations or agreement including, among other things, terms of personal employment. It is my opinion that the majority opinion in this case reaches a result contrary to long established principles of law.